NATIONAL INSURANCE UNDERWRITERS
*v.* Annie Mae MATTHEWS, ex'x
of the Estate of J. M. Matthews, deceased,
and individually

5-4293                                    418 S. W. 2d 391

Opinion delivered September 18, 1967

*Moses, McClellan, Arnold, Owen & McDermott,* for appellant.

*Marion S. Gill,* for appellee.

Carleton Harris, Chief Justice. This litigation involves airplane insurance. J. M. Matthews owned a 1959 Piper Apache Airplane, and on April 1, 1966, purchased a policy of insurance from appellant company, National Insurance Underwriters, the company being hereafter referred to as "National," or appellant. Under the policy, appellant agreed to pay to Matthews the sum of $15,000.00 (with a $1,000.00 deductible provision) in

event the airplane was totally destroyed by coming into contact with the ground, subject, however, to certain exclusions, which form the basis of this litigation. On April 28, 1966, in Desha County, near Winchester, Arkansas, the plane, with Matthews as the sole occupant, crashed, killing Matthews, and totally destroying the aircraft. Thereafter, appellee, Annie Mae Matthews, widow, and executrix of her husband's estate, made due proof of the loss of the plane, but National declined to pay the $14,000.00, tendering, however, the return of $840.09 in premiums. Suit was instituted to recover for the loss, and appellant defended the litigation upon the basis that such loss, due to an exclusion clause in the policy, hereinafter discussed, was not covered. The cause was submitted to a jury, which returned a verdict against appellant in the amount of $13,159.91. From the judgment entered on this verdict, National brings this appeal. For reversal, only one point is relied upon, *viz.*, "There is no substantial evidence to support the verdict of the jury upon which the judgment entered was given."

The exclusion in the policy of insurance relied upon by appellant, and which was pleaded as a defense, provides as follows: "This policy does not apply under Part III A. to loss * * * during or as a result of its the airplane's operation:

* * *

(3) under Instrument Flight Rule (s) (IFR) conditions unless the pilot possesses a valid Instrument rating and is proceeding in accordance with Instrument Flight Rules; * * *"

The parties stipulated that Instrument Flight Rules conditions were conditions other than those authorized for visual flying under Visual Flight Rules, or conditions other than Visual Flight Rules (VFR) conditions. Matthews did not have an instrument rating, and was only authorized to fly by Visual Flight Rules. The pertinent portion of these rules provides as follows:

"(a) Distance from clouds.\*\*\*, no person may operate an aircraft under VFR—\*\*\*\*

(4) Outside controlled airspace at an altitude of more than 1,200 feet above the surface, at a distance less than 500 feet below or 1,000 feet above, and 2,000 feet horizontally from, any cloud formation; or

(5) Outside controlled airspace at an altitude of 1,200 feet or less above the surface, unless the aircraft is clear of clouds.

(b) Flight Visibility.\*\*\*\* no person may operate an aircraft under VFR—

\* \* \*

(3) Outside controlled airspace, unless flight visibility is at least one statute mile."

It was stipulated that the crash occurred about four miles west of Winchester in an area not "known as controlled airspace area." Appellant simply contends that the airplane was being operated under conditions controlled by the exclusion in the policy and that is the sole question for determination in this case.

Appellant concedes that the issuance of the policy, and the payment of the premium thereon, being established by appellee, the burden shifted to it to establish that the loss of the aircraft "was caused by a condition existing at the time by virtue of an incompetent pilot operating the aircraft under IFR conditions when he did not hold an instrument rating. \* \* \*"

Five witnesses, residents of the area in which the mishap occurred, testified, three on behalf of appellant, and two on behalf of appellee. The testimony reflects that the plane circled several times before getting out of control, and the witnesses described sounds which indicated that the engine was not properly functioning. According to Shelby Appleberry:

"Yeah, and then it would, you could hear it back-fire, or pop, or whatever they do after I guess it was when he shut the throttles off. I don't know all that much about it, but anyway when he would open this thing wide open it sound like and when he would close it down it would backfire and it done that two or three times."

Morris Newton, who heard the noise and went outside his house, stated:

"When I first went outside the engines wasn't running wide open there, they sounded like they were popping, cutting out. * * * It sounded more to me like they were opened up but stalling out."

Virgil Abston testified:

"Well, I heard the plane make, go by my place in a generally southwesterly direction at which time I didn't pay too much attention except that it did change the tone of the engines and I had during the daytime on other occasions noticed that some passenger planes had changed, would change their direction due to a cloud formation that they wanted to go around, nevertheless I didn't go out to see until after this plane had made this pass in a southwesterly direction and turn and came and then went pretty well back in a northeasterly direction which was practically the opposite direction where I first heard it. In a few moments I noticed that the plane begin to make some unusual noises for a plane in the air at night or for that matter, in the daytime * * *

* * *

Q. You made some mention of an unusual noise, you noticed something unusual about the motors, please explain that?

A. After I had gone out in the yard and before the airplane appeared there was an unusual thing happened in my opinion, for an airplane and that is it appeared that

the engines were either cut back or that they were idled back to just idle speed, and almost immediately then there was a pop or a normal cough for an engine whichever you want to say, and in a very few moments is when the airplane, I saw the airplane it was just almost in a vertical position, yes sir.''

All witnesses agreed that there were no storm conditions in the area where the crash occurred, nor was there wind, rain, or fog. There was also evidence that many of the farms had ''night lights'' which were burning.[1] The plane crashed at a very slight angle, almost completely vertical. Though there was some testimony to the effect that the witnesses, on going outside of their homes to observe what was happening, could not at all times see the plane (and the time was ''dusk dark''), *not a single witness testified that he saw the aircraft emerge from a cloud.* They could not state (when unable to see the aircraft) whether the plane was above a cloud, or in it, or whether the pilot simply did not have the plane's landing lights on at all times.

Arthur L. Mayer, an airplane pilot, who lives at Dumas, testified as an expert. The witness has been flying 27 years, and has more than 27,000 hours flying time. He has frequently acted as an instructor, but does not have an instrument rating. He explained the regulation here in question by pointing out on a diagram that flying by Visible Flight Rules simply means that a person is:

* * * flying five hundred feet below the clouds and this one means a thousand feet above the clouds; in other words, there wouldn't necessarily have to be two clouds here, that is just to show the point. He could fly under the cloud at five hundred feet, two thousand feet

---

[1]Appellee points out that these lights would have aided Matthews in locating his position, and it is argued that this is another circumstance indicating that the plane was "in trouble," rather than lost.

horizontally or one [statute] mile² visibility outside a controlled zone, but he must stay a thousand feet above it."

The witness stated that darkness, wind, and rain, in themselves, have nothing to do with Instrument Flying Rules conditions, and that IFR and VFR regulations are affected only by clouds and visibility.

Weather reports from Memphis, Little Rock, and Pine Bluff were introduced into evidence, and Mayer, after examining these, testified that the weather conditions existing, as shown in the reports, did not constitute Instrument Flight Rules conditions, because there was a minimum for visual flight. Mayer testified that he personally could have flown a plane under the conditions reflected by the weather reports without violating Instrument Flight Rules. The witness further stated that on the night of April 28, around 7:30 P.M. (the approximate time of the crash) he was returning home to Dumas from Belco Lake; that the moon and stars were shining, and there were only a few scattered clouds; that the conditions existing did not constitute IFR conditions.

Of course, it was the function of the jury to pass upon the facts, and we are only concerned with whether there was substantial evidence to support the verdict. Furthermore, as stated in *Glens Falls Insurance Company* v. *Browning, et al*, 228 Ark. 1087, 312 S. W. 2d 335, the testimony must be viewed in the light most favorable to appellee. When we consider these facts, it is evident that appellant has not met the burden of establishing that this plane was being operated in violation of the exclusive provision listed in the insurance policy. There simply was no proof as to the altitude of the plane, and not a single witness was able to say that the plane was ever flying in the clouds. Actually, there is

---

²According to the witness, a statute mile is 5,280 feet, *i.e.*, the pilot must be able to see one mile.

as much, if not more, evidence that the crash was caused by engine trouble.

Appellee requests an additional attorney's fee in this court, and we are of the opinion that this should be allowed in the amount of $1,000.00.

It is so ordered.

Affirmed.