Norma Jean **GLOVER** et al., Petitioners,

v.

**NATIONAL INSURANCE
UNDERWRITERS,**
Respondent.

No. B–5917.

Supreme Court of Texas.

Jan. 12, 1977.

Rehearing Denied Feb. 16, 1977.

Warren Heagy, Odessa, Byrd, Davis, Eisenberg & Clark, Tom Davis, Austin, for petitioners.

Lord, Bissell & Brook, Terry Backus, Chicago, Ill., Little & Palmer, Jack Little, Big Spring, Fulbright & Jaworski, L. S. Carsey and Hugh Griffin, Houston, for respondent.

GREENHILL, Chief Justice.

The question in this case is whether the pilot of an airplane which crashed and killed all aboard was "properly rated for the flight" within the meaning of an aviation liability insurance policy. The trial court held that he was and entered judgment for the petitioners. The court of civil appeals, with one justice dissenting, reversed the judgment of the trial court and rendered judgment for the insurer. Tex.Civ.App., 535 S.W.2d 662. We reverse the judgment of the court of civil appeals and affirm that of the trial court.

The crash in question occurred on the Mexican border near Quemado, Texas, north of Eagle Pass, on December 9, 1972. The pilot of the airplane was William O. Rogers, and he was accompanied by two passengers on the flight, Burlon E. Glover and Ray Eugene Rives. All were killed.

The petitioners, herein referred to as the plaintiffs, are the wives and children of the deceased passengers. They brought an action against the estate of the pilot, Rogers, and against the Bill Rogers Trucking Company for the wrongful deaths of Glover and Rives. National Insurance Underwriters, herein called National, had prior to the crash issued a liability insurance policy to the owner of the airplane, the Bill Rogers Trucking Company. National refused to defend the wrongful death suit and denied liability under the policy it had issued to the trucking company. The parties to that suit then entered into an agreement that National would institute this suit, a declaratory judgment action, to determine its liability to the estate of Rogers under the insurance policy. The agreement provided that if National were found to be liable, then it would pay to the plaintiffs the policy limits in full settlement of their cause of action against the estate. On the other hand, if National were found not to be liable under the policy, then the plaintiffs agreed that they would dismiss their wrongful death action and make no further effort to recover for the deaths of the passengers.

Pursuant to the agreement, National brought this declaratory judgment action against the people we here call "the plaintiffs." The parties filed a document of stipulated facts in the trial court and submitted the cause to that court for determination. The trial court found as a matter of law that the insurance policy afforded coverage, and it ordered National to pay the plaintiffs the policy limits. The court of civil appeals reversed and rendered judgment for National. Tex.Civ.App., 535 S.W.2d 662.

The insurance policy was attached as an exhibit to the stipulated facts. Under Part I of this policy, National agreed to pay all sums which the insured would become legally obligated to pay as damages because of bodily injury or death, sustained by any person, including occupants. Under "Exclusions Applicable to Part I," however, the policy contained a provisions commonly known as a "Pilot Warranty Clause." This clause provided that coverage under Part I would *not apply* "to any aircraft, while in flight, . . . whenever the pilot operating the aircraft is not qualified in accordance with the requirements specified in Item 6 . . . ." Item 6 of the declarations provided in part:

PILOTS: This policy applies when the aircraft is in flight:

(a) [only when being operated by Rogers]

    *     *     *     *     *     *

(b) while holding an F.A.A. pilot certificate and ratings at least equal to those described below, with a currently effective Medical Certificate, and *while properly rated for the flight* and the aircraft,

      (Pilot Certificate & Ratings)

Private

    *     *     *     *     *     *

[Emphasis supplied]

National's contention is that the pilot of the airplane, Rogers, was not "properly rated for the flight." It is therefore argued that the pilot clause operated to suspend National's liability under the policy. The plaintiffs, on the other hand, argue that Rogers was "properly rated for the flight" and that

National is therefore liable under its contract of insurance.

The case was tried upon an "Agreed Statement of Facts" and five attached exhibits. The agreed statement recites that the passengers, Glover and Rives, were business acquaintances of Rogers, and the three men were en route from Odessa to Eagle Pass on a fishing trip when the crash occurred. The site of the crash was between Del Rio and Eagle Pass, about 30 miles southeast of Del Rio and 204 miles southeast of Odessa. The airplane was a single engine Piper aircraft. Rogers had a private pilot's license to operate a single engine land aircraft, but he did not have an instrument flight rating.

At 7:55 a.m. on December 9, 1972, Mr. Rogers called the Midland F.A.A. Flight Service Station and requested a weather briefing for a flight from Odessa to Eagle Pass. He stated that his departure time would be in three or four hours. He was told that at 7:00 a.m., the weather conditions at Midland and Del Rio were "indefinite 100 feet obscuration, [100 percent of the sky hidden], with the visibility of ½ mile and fog." He was also told that the area forecast indicated ceilings below 1000 feet with visibility of less than two miles; and from 7:00 a.m. to 7:00 p.m., the forecast was for 300 to 800 foot ceilings, overcast, with visibility of from one to three miles and occasional near zero ceiling and visibility conditions.

Later that morning, the weather had cleared considerably in the Midland-Odessa area. At 9:00 a.m. the Midland Air Terminal recorded the conditions as showing scattered clouds at 400 and 15,000 feet, a ceiling of 25,000 feet overcast, and visibility estimated at four miles, with ground fog. At that time, the three men took off from Odessa on their flight to Eagle Pass. Rogers filed no flight plan and did not request a weather briefing before taking off.

At the time the men took off from Odessa, the conditions in the Del Rio area had not improved from those reported at 7:00 a.m., nor did they improve later in the day. At 9:20 a.m., Del Rio had a ceiling of 100 feet with visibility of one-half mile. At 11:05 a.m. and at 12:00 noon, Del Rio reported the weather as cloudy with fog, and with a ceiling of 200 feet and visibility of one-half mile. At approximately 11:20 a.m., the aircraft crashed near Quemado.

The above weather reports and weather forecasts recited in the agreed statement were apparently taken from a National Transportation Safety Board report that was attached as an exhibit to the agreed statement. This report summarized an N.T.S.B. investigation that was conducted after the crash, and the accuracy of the material in that report was stipulated to by the parties. Included in the report was a statement by the Air Traffic Control Specialist who briefed Rogers on the weather conditions on the morning of the flight. The Specialist's statement contained the following:

> At 1355 GMT [Greenwich Mean Time] the pilot of N7714P [Rogers] called by telephone and requested an outlook for a proposed VFR flight from Ector County Airport, Odessa, Texas to Eagle Pass, Texas. His proposed departure time was "in the next three or four hours."
>
> I gave the pilot of N7714P all the information available to me at the time which was pertinent to his proposed flight. Source material used for the briefing included surface reports from SA29 091300, MAF FT amendment 09111, and GSW FA 091240 with emphasis on pertinent AIRMET information it contained. The pilot then indicated that he intended to delay departure.

Also attached to the N.T.S.B. report were copies of the weather reports and weather forecasts that were available to the A.T.C. Specialist on the morning of December 9, 1972. These weather reports and forecasts included the forecasts referred to by the A.T.C. Specialist in his statement, but they also included forecasts that were not specifically mentioned by the Specialist. One of these forecasts was a "terminal forecast" for Del Rio. According to a "Key to Aviation Weather Reports," which was issued by the U.S. Department of Commerce and was

revised in 1974, terminal forecasts "contain information for specific airports on expected ceiling, cloud heights, cloud amounts, visibility, weather and obstructions to vision and surface wind." They are issued twice a day and are valid for 24-hour periods.

The Del Rio terminal forecast attached to the N.T.S.B. report was issued at 5:00 a.m. on December 9, 1972; and it indicated that at the time of issuance, Del Rio was reporting a ceiling of 300 feet obscuration with visibility of two miles with fog, variable to a ceiling of 100 feet obscuration with visibility of one-half mile with fog. This terminal forecast went on to forecast that by 8:00 a.m., the ceiling would be 500 feet overcast, with visibility of four miles with fog. The forecasted weather for 10:00 a.m. at Del Rio was a ceiling of 1,000 feet, with scattered clouds at 25,000 feet and visibility of seven miles. At 1:00 p.m., the forecast called for a ceiling of 12,000 feet with scattered clouds, thin scattered clouds at 25,000 feet, and no restrictions as to visibility. Because this forecast is mentioned in the agreed statement of facts, and because the A.T.C. Specialist stated that he gave Rogers "*all* the information available to me at the time which was pertinent to his proposed flight," it is clear that Rogers was given the information contained in the Del Rio terminal forecast on the morning of the flight.

Another exhibit attached to the agreed statement was a sectional map of Texas which showed the presumed flight path of the airplane, the crash site, and the weather conditions existing at the time of the flight. According to the legend on the map, the weather conditions along the flight path of the plane varied from VFR [visual flight rules] over the first one-third of the flight to probable IFR [instrument flight rules] over the second one-third, to definite IFR conditions over the final one-third.

It was stipulated for the purposes of this action that the pilot, Rogers, was negligent in each of the particulars set out in the plaintiffs' petition in the wrongful death

suit. They there alleged that Rogers was negligent:

"(a) In operating the airplane under conditions which required an instrument pilot rating;

(b) In failing to communicate with the various ground communication stations in the Del Rio, Eagle Pass area to ascertain the weather conditions existing in that area;

(c) In operating the airplane at an altitude which was dangerously low to the surface;

(d) In failing to return to Odessa or other alternate airports where the VFR weather existed: [and]

(e) In flying into an area wherein the weather was such that IFR Flight Rules existed with full knowledge of the existing inclement weather conditions."

We agree with the parties that the only question to be here decided is whether Rogers was "properly rated for the flight" within the meaning of the pilot warranty clause. In order to construe properly that clause, a review of the regulations which govern aviation is necessary.

The Federal Aviation Act of 1958, 49 U.S.C. Sections 1301 *et seq.,* gives the Administrator of the Federal Aviation Administration the authority to prescribe reasonable rules and regulations to govern, among other things, airmen and the operation of aircraft in the United States. The regulations promulgated by the Administrator are codified in 14 C.F.R. Sections 1–399 and shall hereafter be referred to as the FARs (Federal Aviation Regulations).[1]

A rating is defined in FAR Section 1.1 as "a statement that, as a part of a certificate, sets forth special conditions, privileges or limitations." A rating known as an "instrument rating" is provided for in FAR Section 61.5 to be placed on pilot certificates when applicable. FAR Section 61.65 sets out the procedures that must be followed to obtain an instrument rating.

---

1. The FARs that are referred to in the opinion appear in the 1976 codification of the C.F.R. The substance of these regulations has not been changed since the time of the crash, and we refer to the 1976 codification only for convenience.

They need not be detailed here; it is sufficient to note that the potential instrument pilot must receive ground instruction and flight instruction, must have attained certain minimums of flight experience, and must have passed both a written and a flight test appropriate to the instrument rating. The requirements necessary to obtain a private pilot certificate, which does not include an instrument rating, are contained in the FARs Sections 61.101 through 61.120; and those sections do not require the same level of instrument flying proficiency and skill as does Section 61.65.

Section 61.3 of the FARs provides that no person may act as a pilot under instrument flight rules (IFR) or in weather conditions less than the minimums prescribed for visual flight rules (VFR) flight, unless he holds an instrument rating. Sections 91.105 through 91.109 set forth the visual flight rules, and Section 91.105 specifies the basic VFR weather minimums. When weather conditions are less favorable than the minimums prescribed in the VFR sections, then those conditions shall be referred to as "IFR conditions"; when they exceed the VFR minimums, they shall be referred to as "VFR conditions." Section 91.105 states, among other things, that a pilot may not operate an aircraft 1,200 feet or less above the surface, outside controlled airspace, unless flight visibility is at least one mile and the aircraft operation is clear of clouds. Therefore, when a pilot operates an airplane in weather less favorable than those minimums, then he is operating the aircraft in IFR conditions; and he violates FAR Section 61.3 unless he has an instrument rating.

Sections 91.115 through 91.129 of the FARs prescribe the instrument flight rules. The only section that need be mentioned here is 91.115. It provides that a flight plan must be filed, and an Air Traffic Controller clearance must be obtained, before a pilot may operate an aircraft under IFR in controlled airspace.

Both National and the plaintiffs have made arguments based upon the stipulated facts, the FARs, and the reported cases that have involved exclusionary clauses in insurance policies. Almost all of the cases cited to us by the parties involved fact situations and exclusionary clauses different from those here in issue. *See, e.g., Mang v. Travelers Insurance Co.,* 412 S.W.2d 672 (Tex.Civ.App.1967, writ ref'd); *Ranger Insurance Co. v. Rogers,* 530 S.W.2d 162 (Tex. Civ.App.1975, writ ref'd n.r.e.); *Insurance Co. of North America v. Maurer,* 505 S.W.2d 931 (Tex.Civ.App.1974, writ ref'd n.r.e.). *See also Ranger Insurance Co. v. Culberson,* 454 F.2d 857 (5th Cir. 1971), *cert. denied,* 407 U.S. 916, 92 S.Ct. 2440, 32 L.Ed.2d 691 (1972); *Bequette v. National Insurance Underwriters,* 429 F.2d 896 (9th Cir. 1970); *Arnold v. Globe Indemnity Co.,* 416 F.2d 119 (8th Cir. 1969); *Woods v. Insurance Co. of North America,* 38 Cal. App.2d 144, 113 Cal.Rptr. 82 (1st Dist. 1974); *Weissman v. Prashker,* 405 Pa. 226, 175 A.2d 63 (1961).

There is, however, one case in which the same pilot warranty clause as is here presented was at issue, and the facts were very similar to those herein. That case is *National Insurance Underwriters v. King Craft Custom Products, Inc.,* 368 F.Supp. 476 (N.D.Ala.1973), *aff'd per curiam,* 488 F.2d 1393 (5th Cir. 1974). Under the insurance policy there in question, coverage was provided only when the pilot was "properly rated for the flight and the aircraft. . . ."

The flight in *King Craft* was one from Miami to Mobile, Alabama, with an intermediate stop at Panama City. The pilot of the aircraft, who did not have an instrument rating, had been advised that VFR conditions existed at his destination, Mobile; and it was undisputed that the takeoff at Miami and the landing and take-off at Panama City were under VFR conditions. When the pilot reached Mobile, however, he was informed that the ceiling was 500 feet overcast with visibility of seven miles. He then requested an instrument clearance into the airport, which was granted; and he was apparently trying to land by instruments a few minutes later when he crashed.

The insurer contended that the pilot was not "properly rated for the flight," but the trial court disagreed. It assumed that the pilot operated the airplane in IFR conditions at Mobile, but it held that "the flight" was a VFR flight from Panama City to Mobile, a flight for which the pilot was properly rated. The court stated that the pilot had at most violated the Federal Aviation Regulations by attempting to land in weather conditions which required an instrument rating. It viewed the words "the flight" used in the pilot clause as referring to the entire time the aircraft was in flight, and rejected the insurer's attempt to break the flight into segments which would require different ratings for each segment. The court also rejected the insurer's attempt to show that the pilot voluntarily and knowingly attempted an instrument flight when he had other choices open, and stated that such proof would be an attempt to add language to the policy which was not there. It further believed that the effect of construing the policy as argued by the insurer would be to have coverage flickering on and off as the airplane entered and departed from differing weather conditions. The *King Craft* court thought that such a construction should be avoided unless the language of the policy clearly demanded it.

The question here is essentially the same as the question which was before the court in *King Craft,* that is, was the pilot "properly rated for the flight" that ended in his death and the deaths of his passengers? The answer to this question requires an analysis of the pilot warranty clause, and its applicability to the stipulated facts of this case. In view of the Federal Aviation Regulations, which define "ratings" and prescribe the rules for aircraft operation, we believe that our inquiry should be directed to the meaning of the term "the flight" in the pilot clause. Once it is determined what "the flight" was that Rogers and his passengers undertook on December 9, 1972, then whether he was "properly rated" for it may be ascertained by reference to the relevant FARs.

In making our inquiry, we are mindful of the rules of construction set forth in *Continental Casualty Co. v. Warren,* 152 Tex. 164, 254 S.W.2d 762 (1953). That case stated the rule to be that exceptions and rules of limitation will be strictly construed against the insurer. Further, we must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent. *Warren, supra,* at 763. *See also Insurance Co. of North America v. Cash,* 475 S.W.2d 912 (Tex.1972). On the other hand, we recognize that these rules of construction will be applied only when the language of the policy is such that it may reasonably be given one of several constructions. *Mang v. Travelers Insurance Co.,* 412 S.W.2d 672, 674 (Tex.Civ.App.1967, writ ref'd). In other words, the plain language of an insurance policy, like that of any other contract, will be given effect when the parties' intent may be discerned from that language. But when the language of an insurance contract is ambiguous, that is, is subject to two or more reasonable interpretations, then that construction which affords coverage will be the one adopted.

We have concluded that the pilot clause here in issue is ambiguous. One possible construction of the clause finds support in the dissenting opinion in the court of civil appeals below and in *Weissman v. Prashker, supra.* Under this construction, "the flight" of an aircraft could be viewed as being either a visual flight or an instrument flight, depending on the conduct of the pilot in operating the airplane. If the pilot used only his instruments to maintain the proper attitude, altitude, velocity, navigational course, and other positions of the craft, then "the flight" would be an instrument flight. If, however, the pilot used his instruments only partially, and used his vision to maintain, for example, the proper attitude of the aircraft, then "the flight" would be a visual one. Under this construction, the weather conditions in which the air-

plane was being flown would have no bearing on the type of flight that was being conducted. A visual flight could be conducted in zero visibility conditions as long as the pilot was attempting to fly visually, and a pilot without an instrument rating would be "properly rated" for that flight. Conversely, a pilot who was flying by instruments would not be properly rated for his flight unless he possessed an instrument rating.

Other interpretations of the meaning of this pilot clause are also possible if the FARs relating to instrument flight rules and visual flight rules are referred to. For example, the plaintiffs argue that "the flight" may be characterized as either a VFR flight or an IFR flight. They point out that an IFR flight is defined as an "aircraft conducting flight in accordance with instrument flight rules." *See* Pilot/Controller Glossary, 1 Airman's Information Manual 19 (May 1976). They note that FAR Section 91.115 provides that no person may operate an aircraft in controlled airspace under IFR unless he has filed an IFR flight plan. They then argue that because Rogers did not file a flight plan, then "the flight" was not an IFR flight and was, accordingly, a VFR flight.

National's contention is essentially the converse of the plaintiffs' argument. It too argues that "the flight" may be either an IFR flight or a VFR flight, but would define a VFR flight as one conducted in accordance with visual flight rules. It would then characterize the operation of an aircraft in violation of the visual flight rules to be an IFR flight, for which a pilot would need an instrument rating in order to be properly rated. Because FAR Section 61.3(e) states that a pilot may not operate an aircraft in IFR weather conditions unless he holds an instrument rating, and because it was stipulated that Rogers operated the plane, and the crash occurred, in IFR conditions, National argues that "the flight" was an IFR flight for which Rogers was not properly rated. A majority of the court of civil appeals adopted this reasoning

in holding for National. *See* 535 S.W.2d at 665.

■ Still another interpretation of the term "the flight" is that undertaken by the court in *King Craft, supra.* That court would also characterize the flight as being an IFR flight or a VFR flight, but it characterized the flight as a whole, rather than in segments, as being IFR or VFR. Under the interpretation urged by National, the IFR or VFR status of the flight would change as the pilot entered differing weather conditions; and, therefore, one segment of the entire flight might be an "IFR flight," whereas another segment of the same flight might be classified as a "VFR flight." The *King Craft* court was reluctant to adopt a construction under which insurance coverage would change as the pilot encountered differing weather conditions unless the language of the policy clearly demanded such a result. We, too, are reluctant to adopt such a construction. We also note, as did the *King Craft* court, that the insurance policy before us defines "in flight" as "the period from the time the aircraft moves forward in taking off or in attempting to take off for air transit, while in the air, and until the aircraft completes its landing and landing run after contact with land or water." We therefore hold that "the flight," as used in this pilot warranty clause, refers to the entire time the aircraft is in flight; and "the flight" must be looked at as a whole, rather than in segments, in determining its IFR or VFR character.

■ The remaining question is whether the flight of the Rogers aircraft in this case was a VFR flight, for which the pilot was properly rated, or an IFR flight, for which he was not. The answer to this question depends on at what point in time the status of the flight should be determined. We have concluded, as did the *King Craft* court, that the flight should be characterized as of its inception. The weather conditions existing at the beginning of the flight should thus be looked to in determining whether the flight is a VFR or an IFR flight. National argues that the knowledge of the

pilot of the weather conditions along his flight path and at his destination should also be considered in characterizing the flight. It argues that if the pilot takes off in VFR weather with knowledge that IFR conditions exist at his destination, then the flight is an IFR flight for which the non-instrument rated pilot is not properly rated. It would distinguish *King Craft* on the ground that the pilot there did not know that IFR conditions would exist at his destination. A majority of the court of civil appeals below distinguished *King Craft* on that ground and stated that in this case the pilot knowingly flew into IFR conditions for which he was not properly rated. 535 S.W.2d at 666. The plaintiffs, on the other hand, vigorously contend that it was not stipulated that Rogers knowingly flew into IFR conditions and that the court of civil appeals was erroneous in so concluding. The plaintiffs also argue that the weather forecasts which Rogers received on the morning of the flight show that he fully expected to encounter VFR conditions at Eagle Pass that day.

■ We are not inclined to consider as controlling the pilot's knowledge of weather conditions along his flight path or at his destination in characterizing a flight as an IFR or VFR flight. Our reluctance arises from our belief that very few pilots actually *know* when they take off what weather conditions they will encounter over two hours later. When a pilot begins a flight, he has an *expectation* of what weather conditions will exist later on during the flight; and this expectation is necessarily based upon his knowledge of the weather conditions existing when he takes off and the forecasts as to how those conditions will change by the time he gets to his destination. An inquiry into a pilot's *knowledge* as to the weather conditions he will encounter at his destination, therefore, would in most cases involve questions as to the pilot's expectations and the reasonableness of those expectations in the face of the weather forecasts he received. Inquiries into the reasonableness of a person's actions might best be ignored in determining the coverage of an insurance policy designed to protect

one from the consequences of one's own negligence, especially where the language of the policy does not clearly dictate such an inquiry.

■ Even if the pilot's knowledge is to be considered in characterizing the flight, the stipulated facts show that Rogers did not know at the flight's beginning that he would be forced to operate his aircraft under IFR weather conditions. The flight is to be characterized at its inception; therefore, if the pilot's knowledge is important, the knowledge that he will be flying in IFR weather must exist at the flight's inception. The weather reports Rogers received before take-off indicated that IFR conditions existed along his flight path and at Del Rio, but the Del Rio terminal forecast forecasted that definite VFR weather would exist at Del Rio at his expected arrival time. The forecast proved to be wrong, and Rogers was negligent in beginning his flight into IFR conditions; but he did not *know* when he took off that he was flying into IFR weather. Therefore, even if Rogers' knowledge is relevant in characterizing the flight, as National argues, the facts show that he did not possess the knowledge ascribed to him by the insurer.

Furthermore, the weather conditions existing at the flight's beginning were definitely VFR conditions. The Midland Air Terminal reported that the ceiling was 25,000 feet overcast with scattered clouds at 400 and 15,000 feet elevations, and the visibility was estimated to have been four miles. The parties stipulated that the flight began in VFR conditions and that the first one-third of the flight was conducted in VFR weather. We therefore conclude that the flight on which Rogers and his passengers embarked was a VFR flight, and Rogers was properly rated to fly it. The pilot warranty clause did not operate to exclude coverage and National is liable under the insurance policy.

Our holding may seem harsh to the insurer because we have held this insurance policy applicable even though it is undisputed that the non-instrument rated pilot was fly-

ing in IFR conditions when the crash occurred. We note that our construction of this pilot clause was necessary, however, only because National chose to phrase the insurance policy in the ambiguous manner heretofore discussed. Language was available to, and known to, National which would have clearly and plainly excluded from coverage a non-instrument rated pilot who operated his aircraft in IFR weather conditions. *See Arnold v. Globe Indemnity Co.,* 416 F.2d 119 (6th Cir. 1969); *National Insurance Underwriters v. Matthews,* 243 Ark. 26, 418 S.W.2d 391 (1967).

The judgment of the court of civil appeals is reversed and that of the trial court is affirmed.

Dissenting opinion by SAM D. JOHN-SON, J., in which POPE, J., joins.

YARBROUGH, J., not sitting. He was not a member of the Court when the cause was orally argued before this Court.

SAM D. JOHNSON, Justice (dissenting).

This dissent is respectfully submitted.

On the morning of his fatal flight the pilot called the FAA Flight Service Station in Midland at 7:55. He received information of IFR conditions not only locally but also throughout the entirety of his contemplated flight. By 9:20 a.m., the time of his departure, the local weather had cleared somewhat to VFR conditions. The forecast, however, was for continued IFR conditions throughout most of his flight and at his destination. According to the stipulation the forecast proved accurate for only the first one third of his flight was in VFR conditions. The next one third was in probable IFR conditions and the final one third in definite IFR conditions.

The pilot was rated and qualified for flight in VFR conditions. He was not, however, rated or qualified for flight in IFR conditions. Indeed, it was stipulated that he was negligent in operating the aircraft under conditions requiring instrument pilot rating, in failing to communicate to ascertain weather conditions in the area, in failing to return to the point of his depar-

ture or alternative airports where VFR conditions existed, and in flying into an area where the weather was such that IFR flight rules existed with full knowledge of the existing inclement weather conditions.

The essential question posed by the majority is whether the pilot was "properly rated for the flight" that ended in his death and the deaths of his two passengers. The majority first considers "the flight" that was undertaken. Citing *National Insurance Underwriters v. King Craft Custom Products, Inc.,* 368 F.Supp. 476 (N.D.Ala. 1973), *aff'd per curiam,* 488 F.2d 1393 (5th Cir. 1974), the majority concludes "that 'the flight,' as used in this pilot warranty clause, refers to the entire time the aircraft is in flight; and 'the flight' must be looked at as a whole, rather than in segments, in determining its IFR or VFR character." This writer respectfully disagrees. It may well be that under some circumstances a pilot can be "properly rated" for one segment and not another.

The majority next poses its remaining question, "whether the flight of the Rogers aircraft in this case was a VFR flight, for which the pilot was properly rated, or an IFR flight, for which he was not." The majority then responds to its own question by stating that the answer depends on a particular point in time at which the status of the entire flight will be determined. The majority then concludes that the entire flight will be characterized as of its inception.

It is important to follow the reasoning of the majority: first, in determining the character of the flight as VFR or IFR it will be looked at as a *whole;* and, second, that determination (of the whole) will be based on the conditions (VFR or IFR) at the inception of the flight *only.*

The policy, however, defines "in flight" as being from the time the aircraft moves forward in taking off, while in the air, and until the aircraft completes its landing. The policy language makes it clear that the flight contemplated is the entire travel, from the beginning to the end, and that the

pilot is therefore required to be properly rated for all segments of the flight. According to the stipulation here, the pilot flew directly into IFR weather, a condition of which he had been advised before the flight began and a condition of which he had full knowledge. Moreover, he voluntarily pursued his flight in IFR conditions rather than turn back and, finally, he crashed disastrously in IFR conditions near Quemado.

Under the circumstances of this case, the pilot was not "properly rated for the flight" and consequently this writer would agree with the majority of the court of civil appeals.

POPE, J., joins in this dissent.