RESERVOIR DATA, INC.,
Plaintiff-Appellant,

v.

AMOCO PRODUCTION
COMPANY, Defendant,

Dixie Insurance Company,
Defendant-Appellee.

No. 85–2861
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

June 30, 1986.

Harvey F. Cohen, Houston, Tex., for plaintiff-appellant.

R. Scott Hogarty, Houston, Tex., for defendant-appellee.

Before RUBIN, JOHNSON, and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

An insured in the business of testing reservoir pressures in the wellbore of oil and gas wells sued its insurer to recover the cost of equipment lost while conducting such a test. The insurance policy contained an exclusion which provided that equipment forming part of a well-drilling operation was not insured. The district court interpreted the exclusion to preclude coverage for equipment lost by the wireline operator when conducting pressure tests, immediately after drilling had been completed, for the purpose of determining the status of the reservoir. The district court also held that as to covered losses, an offer of settlement was sufficiently a "tender" under Texas law to relieve the insurer of liability for attorney's fees. Finding no error in the district court's decision, we affirm.

I.

Reservoir Data, Inc., is engaged in the business of recording and analyzing downhole pressures in oil and gas wells. After the hole is drilled, Reservoir Data lowers a probe and other equipment into the wellbore suspended from a cable known as a wireline. While it was thus testing a well

in Wyoming, the wireline was severed. Reservoir Data lost a sour gas wireline, a pressure probe, and certain accessories, together valued at over $137,000. It made a claim for the total value of all the property lost, less the $10,000 per occurrence deductible specified in the policy. Its insurer, Dixie Insurance, denied liability for the sour gas wireline and its attached bottom contact sub on the basis of a policy exclusion, but conceded liability for other equipment that was lost in the event. The wireline and sub were valued at over $115,000. Dixie Insurance offered to pay $18,362 for the property that it conceded to be covered.

The insurance policy contained an exclusion that provided: "This policy does not insure: ... [p]roperty located in or forming part of any underground mine or of any mining or well drilling operation." In addition, it contained an endorsement amending that exclusion to except from the exclusion, and thus to include in the policy coverage, "Items # 125, 126, 127, 128, or 129 of the schedules attached to" the policy. These items were quartz pressure probes, temperature tools, wireline jars, and hydraulic jars. Such equipment had been attached to the wireline and lost in the well.

## II.

■ Reservoir Data argues that, since its wireline was not lost while the hole was being bored, it is not excluded from coverage. Referring to the policy terms, it contends the wireline was not part of a well-drilling operation and was not exposed to drilling hazards. It contends the policy was subject to more than one reasonable interpretation and, therefore, should be construed to afford, rather than exclude, coverage.

Texas applies principles generally accepted to interpretation of insured contracts.

The contract must be construed as a whole, and a reading that renders all parts of the contract significant is preferred to one that makes some part of it meaningless.[1] An ambiguity may not be created by reading part of a policy out of context. If a written contract is so worded that it can be given a definite interpretation, it is not ambiguous.[2] If, however, thus read the policy lends itself to more than one interpretation, the reading that favors the insured is to be adopted even if the construction urged by the insurer appears to be more reasonable.[3] "The policy of strict construction against the insurer is especially strong when the court is dealing with exceptions and words of limitation."[4]

When the policy issued to Reservoir Data is read as a whole, however, the exclusion is not ambiguous. If the endorsement is integrated into the main body of the policy and the phrase "Items # 125, 126, 127, 128 or 129 of the scheduled attached to" the policy, is replaced with the description of the equipment exempted, the policy reads as follows:

> This policy does not insure: ... Property located in or forming part of any ... well drilling operation, except this exclusion does not apply to [quartz pressure probes, temperature tools, wireline jars, and hydraulic jars].

Thus, the term "property located in or forming part of any ... well drilling operation ..." is interpreted by the policy itself to *include* the specific items mentioned, all of which were used in conjunction with the wireline. Therefore, the parties themselves have indicated that pressure testing, even though done after the hole is drilled, is part of the well-drilling operation. This construction is also supported by the facts of the testing procedure. While the hole had been completed, the well had not been,

1. *Sekel v. Aetna Life Ins. Co.,* 704 F.2d 1335, 1339 (5th Cir.1983); *Melton v. Ranger Ins. Co.,* 515 S.W.2d 371, 374 (Tex.Civ.App.1974, writ ref'd, n.r.e.).

2. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951); *Lewis v. East*

*Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941).

3. *Glover v. National Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977).

4. *Blaylock v. American Guar. Bank Liab. Ins. Co.,* 632 S.W.2d 719, 721 (Tex.1982).

for the purpose of the test was to enable the operator to decide what equipment to put into the hole to obtain satisfactory production from the well.

Reservoir Data's proposed interpretation, that "well drilling operation" means solely the boring of the hole, would make the policy endorsement meaningless as a whole because Reservoir Data never engages in the boring of holes, and would make the exemption nonsensical, because the equipment exempted (the quartz pressure probes and other items) is never used in the boring of the hole. For these reasons, we reject the Reservoir Data interpretation.

### III.

After Reservoir Data made its demand, Dixie offered to pay it $18,362.60 but Reservoir Data refused the offer. The final judgment of the district court was for $12,179.36. Therefore, the offer was more than the amount found due. Reservoir Data contends that, nonetheless, it is entitled to attorney's fees because Texas law renders an insurer liable to the insured for attorney's fees incurred in litigation if it fails to tender the amount of the claim [5] and Dixie made no formal tender of the sum due. A formal tender is, however, unnecessary if the creditor makes it clear that he will not accept the sum legally due.[6]

For these reasons, the judgment is AFFIRMED.

---

**5.** 1985 Tex.Sess.Law Serv. 7043, 7123 (Vernon) (ch. 959, §§ 38.001–.002) (to be codified at Tex. Civ.Prac. & Remedies Code §§ 38.001–.002).

**6.** *Warrier Constr., Inc. v. Small Business Inv. Co. of Houston,* 536 S.W.2d 382, 386 (Tex.Civ.App. 1976).