Lillian **CICCIARELLA,** James
F. **Halloran,** and Vickey
C. **Halloran,** M.D.

v.

**AMICA MUTUAL INSURANCE
COMPANY.**

Civ. A. No. G–94–254.

United States District Court,
S.D. Texas,
Galveston Division.

Nov. 22, 1994.

489

Bernard Thorpe Halloran, Houston, TX, for plaintiffs.

J. Preston Wrotenbery, Hirsch Glover Robinson & Sheiness, Houston, TX, for defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KENT, District Judge.

Pending before the Court is Defendant Amica Mutual Insurance Company's Motion for Partial Summary Judgment pursuant to Fed.R.Civ.P. 56(c). For the reasons stated below, the Motion is GRANTED.

### I. Background

This is an action to recover under an automobile insurance policy for personal injuries sustained by the Plaintiff. On September 1, 1991, Defendant Amica Mutual Insurance Company reissued a policy of auto insurance to James F. Halloran and Vickey C. Halloran, M.D. All premiums on the policy were paid, and the policy was in full force and effect on April 12, 1992.

On April 11, 1992, James and Vickey Halloran traveled to Brooklyn, New York to attend a medical seminar. On the following day, April 12, 1992, James and Vickey Halloran and Plaintiff were each allegedly injured in Kings County, New York, when the rental car in which they were riding was struck from the rear by another vehicle driven by Karl Healy. Plaintiff is the mother of Vickey Halloran, and is the mother-in-law of James Halloran. The accident was the direct and proximate result of the negligence of Karl Healy. Healy, the offending driver, was underinsured. Plaintiff, as well as the Hallorans, filed claims with the Defendant under the policy for the benefits of its uninsured/underinsured protection. Defendant withheld payment and benefits.

Subsequently, Plaintiff and the Hallorans filed suit in this Court, alleging causes of action under the theories of breach of contract, breach of the duties of good faith and fair dealing, and violation of Article 21.21 of the Texas Insurance Code. Plaintiff and the Hallorans sought to recover at least $100,000 in actual damages, as well as exemplary damages and attorneys fees.

On July 8, 1994, Defendant entered into an accord and settlement with James and Vickey Halloran. The Plaintiff stipulated and agreed to the terms of this settlement. This partial judgment in no way affected the claims or causes of action maintained by the Plaintiff. On July 29, 1994, Plaintiff and Defendant filed a Joint Motion for Severance of the extra-contractual claims for bad faith and violations of the Texas Insurance Code from the underinsured motorist claim. The Court granted the Motion for Severance on August 2, 1994.

Defendants then filed the present Motion for Partial Summary Judgment, alleging that they are entitled to judgment as a matter of law because the undisputed facts conclusively establish that Plaintiff was not a resident of the same household as the Hallorans on April 12, 1992. The Underinsured Motorist Coverage of the insurance policy provides in pertinent part:

> We [Amica] will pay damages which a **covered person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of bodily injury sustained by a **covered person,** or **property damage** caused by an accident.

The policy defines the term "covered person" as "you or any **family member.**" The policy defined "family member" as "[a] person who is a resident of your household and related to you by blood, marriage or adoption."

Defendant alleges that James and Vickey Halloran resided in Houston on the date of the accident, while Plaintiff resided in Brooklyn, New York, on that date. Therefore, Defendant argues that Plaintiff could not be a resident of the Halloran household for purposes of availing herself of the protection afforded under Dr. Halloran's automobile insurance policy.

In response thereto, Plaintiff contends that Dr. Halloran maintained a dual residence in both Brooklyn and Houston; therefore, Plaintiff was properly a resident of Dr. Halloran's household.

### II. Standard of Review

■ Defendant has filed a Motion for Summary Judgment on the grounds that Plaintiff is not a covered person as defined in the insurance policy. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. A fact is material if its resolution in

favor of one party might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if there is a genuine issue for trial that must be decided by the trier of fact. In other words, summary judgment should not be granted if the evidence indicates that a reasonable factfinder could find in favor of the non-moving party. *Id.* See also *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In ruling on a Motion for Summary Judgment, the Court must accept the evidence of the non-moving party and draw all justifiable inferences in his favor. Credibility determinations, weighing of the evidence, and the drawing of reasonable inferences are left to the trier of fact. *Anderson v. Liberty Lobby, supra,* 477 U.S. at 255, 106 S.Ct. at 2514.

Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the non-moving party to establish the existence of a genuine issue for trial. *Matsushita, supra,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Leonard v. Dixie Well Serv. & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir.1987). Where the moving party has met its Rule 56(c) burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita, supra,* 475 U.S. at 596–97, 106 S.Ct. at 1361 (quoting Fed. R.Civ.P. 56(e)) (emphasis in original).

### III. Discussion

Texas insurance law must govern the Court's interpretation of the Texas Personal Automobile Insurance Policy. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Porter v. American Optical Corp.,* 641 F.2d 1128, 1141–45 (5th Cir.), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Well-established Texas law mandates that when language chosen by the insurer is susceptible of more than one construction, the language should be construed liberally in favor of the insured and strictly against the insurer. *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 666 (Tex. 1987); *Glover v. National Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977); *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 349 (Tex.1976).

However, unambiguous language in an insurance contract must be given its plain, ordinary and generally accepted meaning. *Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984). Further, summary judgment is appropriate in cases where such unambiguous language is at issue. *Phillips v. Union Bankers Ins. Co.,* 812 S.W.2d 616, 617 (Tex. App.—Dallas 1991, no writ).

Where the language in an insurance policy is subject to two or more reasonable interpretations, the construction affording coverage will be used. If the contract is ambiguous, and the insurance contract is capable of two constructions, one granting recovery and the other denying it, the one granting recovery will prevail. *Balderama v. Western Casualty Life Insurance Company,* 794 S.W.2d 84 (Tex.App.—San Antonio 1990).

In construing the policy, this Court will first examine the seminal issue of residency as set forth in the policy. As discussed above, a "family member" was defined in the policy as "a person who is a *resident of your household,* and related to you by blood, marriage or adoption." (emphasis added). In addressing the issue of residency as it applies under the policy, the Court deems the following facts to be of particular relevance: (1) James and Vickey Halloran represented that their residence was Houston, Texas, to the police at the site of the accident, to the hospital personnel, to the rental car agent, in the insurance report, and in the accident report (Defendant's Motion for Partial Summary Judgment, at 4–5); (2) in her deposition, Dr. Halloran testified that she and her

husband had never maintained their domicile or address to be the Brooklyn house in which Plaintiff resided (Sworn Statement of Vickey C. Halloran, M.D., at 105, lines 9–12); (3) the primary address of Vickey and James Halloran was Houston, Texas (*Id.* at 108, lines 1–6); (4) Plaintiff's address prior to the accident was Brooklyn, New York (*Id.,* at 108, lines 7–9); (5) Vickey and James Halloran were registered to vote in Houston, Texas (*Id.,* at 108, lines 15–20); (6) Vickey and James Halloran spent approximately forty to fifty days out of the year in New York prior to the accident (Sworn Statement of James F. Halloran, at 20, lines 11–16); (7) Dr. Halloran was the sole owner of the house in Brooklyn, New York, and had been the owner for more than sixteen years (Plaintiff's Response to Defendant's Motion for Summary Judgment, at 2); (8) Dr. Halloran paid all of the repair bills for the Brooklyn house (*Id.*); (9) Dr. Halloran paid all taxes, the mortgage, and the casualty insurance on the Brooklyn house (*Id.*); (10) Dr. Halloran purchased and installed all appliances for the Brooklyn house (*Id.*); (11) Dr. Halloran paid all utility bills for the Brooklyn house, (*Id.*); (12) Vickey and James Halloran both maintained complete year-round wardrobes at the Brooklyn house, (*Id.* at 3); (13) James and Vickey Halloran maintained a separate room for their personal use, and used separate personal items from that of the Plaintiff while staying at the Brooklyn house (*Id.*); (14) Dr. Halloran financially supported Plaintiff, and hence Plaintiff paid no rent while living at the Brooklyn house (*Id.*); (15) Dr. Halloran claimed Plaintiff as a dependent on her federal income tax return (*Id.*); (16) Dr. Halloran paid for Plaintiff's medical insurance and other medical expenses (*Id.*); (17) Dr. Halloran maintained a joint savings account with Plaintiff in Brooklyn, New York (*Id.*); (18) Dr. Halloran contacted Plaintiff by telephone one to three times daily (*Id.*); and (19) Dr. Halloran maintained her medical license in the state of New York (*Id.*).

■ While a person may only have a single legal domicile, a person may have more than one residence. *Cauble v. Gray,* 604 S.W.2d 197 (Tex.App.—Dallas, 1979). In *Brown v. Tucker,* 652 S.W.2d 492 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd

n.r.e.), the Court held that a minor son was not a resident of the same household as his parents. The sixteen-year-old was injured when he was thrown from the bed of a pickup truck during an accident. The minor sued Aetna Casualty & Insurance Company, seeking benefits provided under his mother and step-father's uninsured/underinsured coverage. Aetna denied coverage on the grounds that the minor son was not a resident of the same household as his mother and step-father when the accident occurred. The central issue in that case was whether the minor was a resident of the same household as that of his mother and step-father.

At the time of the accident, the minor lived with his brother in a trailer approximately five miles from his mother's home. Several months prior to the accident, the minor had moved out of his mother's home and into the trailer. His mother testified that she had agreed to let her son live with his brother temporarily, but that she intended for her son to eventually return home. She further testified that her son was home approximately one-half of the time; that he would visit, eat, and do laundry there; and that she rendered advice and financial assistance to him. Her minor son also kept numerous items of clothing and other personal belongings at his mother's home.

The trial court defined "household" to mean "those who dwell under the same roof and compose a family." *Id.* at 494. On appeal, the minor complained of the trial court's definition of "household." The Houston Court of Appeals reviewed the facts and found the definition to be proper. *Id.*

■ Clearly, the Hallorans did not dwell under the same roof as the Plaintiff, given the fact that they lived more than one-thousand miles away from her. Dr. Halloran testified that Houston was where she and her husband spent the vast majority of their time. In fact, Houston is where the Hallorans repeatedly represented that they lived. Moreover, when the Hallorans traveled to the Brooklyn house, their visits were for short intervals of time, often lasting no longer than four or five days. Although the Hallorans maintained clothing at the Brook-

lyn house, as well as paying the repair bills, taxes, mortgage, and casualty insurance on the Brooklyn house, the Hallorans' only true physical presence at the Brooklyn house occurred exclusively during these intermittent visits. The Hallorans were never regular or extended occupants of the Brooklyn house. Visits amounting to forty to fifty days a year cannot constitute "dwelling together under the same roof."

The Court in *Southern Farm Bureau Casualty Ins. Co. v. Kimball*, 552 S.W.2d 207 (Tex.Civ.App.—Waco 1970, writ ref'd n.r.e.), articulated a different definition of the phrase "resident of the same household." In that case, the Waco Court of Appeals affirmed a jury finding that an estranged husband and wife were residents of the same household, although not living together when the accident that caused the death of the wife occurred. Mr. and Mrs. Kimball were married in 1972. Mrs. Kimball was killed in December of 1975. Before the two separated, Mr. Kimball arranged with his employer to permit his wife to pick up his paychecks. Mrs. Kimball cashed the checks, bought family necessities, and paid the bills with the funds.

In November of 1975, Mrs. Kimball filed suit for divorce. She separated from her husband and moved into her mother's house, taking some articles of clothing with her. After the separation, Mrs. Kimball maintained many of her belongings in the trailer where she had lived with her husband. She continued to meet with Mr. Kimball, and they often went out together. Mrs. Kimball also continued to pick up Mr. Kimball's paycheck and use the money as she thought appropriate. She also continued to perform household functions at the trailer. Although they had discussed the possibility of reconciliation, the Kimballs had not yet agreed to it as of the time of Mrs. Kimball's death.

The trial court instructed the jury that the term "resident" meant "a member of the same family," and that the term "household" meant "persons who dwell together as a family." The Court of Appeals upheld the trial court's jury instructions, holding that "[t]he controlling test of whether persons are residents of the same household at a particular time, within the meaning of the policy in question is not *solely* whether they are then residing together under one roof. The real test is whether the absence of the party at interest from the household of the alleged insured is intended to be permanent or only temporary—i.e., whether there is a physical absence coupled with an intent not to return." (emphasis in the original). *Id.*, at 209. The Court of Appeals concluded that Mrs. Kimball's regular performance of household chores at the trailer and the couple's continuous and frequent personal contact were sufficient evidence to support that the separation between Mr. and Mrs. Kimball was not irrevocably permanent. Therefore, the jury's finding that Mr. and Mrs. Kimball were residents of the same household was affirmed.

In the instant case, the Hallorans and the Plaintiff did not "dwell together as a family" in the Brooklyn house. The Hallorans did not maintain a regular or extended personal presence at the Brooklyn house, but only visited forty to fifty days out of the year. Although Dr. and Mr. Halloran kept a year-round wardrobe in Brooklyn, and Dr. Halloran maintained her New York medical license, it is apparent from the record before this Court that the Hallorans had no manifest intention of returning to the Brooklyn house and making it their permanent home. The Court views the upkeep of a year-round wardrobe as a simple expedience. Having a second wardrobe in Brooklyn obviated the need to transport clothing and other personal articles back and forth from Houston to Brooklyn, and this certainly made traveling less cumbersome for the Hallorans. This Court regards Dr. Halloran's maintenance of her medical license in New York to be consistent with the practice of many professionals who simultaneously maintain licenses in more than one state. Dr. Halloran's license to practice medicine in New York does not necessarily symbolize her intention to return to New York, but rather, it stands to reason that Dr. Halloran was merely keeping various career options open.

Furthermore, the primary contact that Dr. Halloran had with the Plaintiff was by telephone. Contact by telephone among family members in different states cannot be rea-

sonably viewed as "dwelling together." Likewise, while the Hallorans may have provided the Plaintiff with significant financial assistance, this will not suffice to serve as "dwelling together." These types of contacts are clearly distinguishable from the personal daily contact that existed between the Kimballs.

The type of contact that the Hallorans maintained with the Plaintiff is more similar to that detailed in *Brown, supra.* The Hallorans and the Plaintiff maintained separate, independent households. If anything, the minor son in *Brown* had a more substantial contact with his mother and step-father than that which existed between the Hallorans and Plaintiff. Specifically, the minor resided only five miles from his parents and visited them in person. His visits did not take place over the telephone line. Additionally, the minor spent nearly one-half of his time physically present in his parents' home, while the Hallorans spent only forty to fifty days with Plaintiff at the Brooklyn address. Thus, this Court finds that Plaintiff was not a resident of the named insureds' household, namely Dr. and Mr. Halloran. Therefore, Plaintiff is not entitled to the protection afforded by the Texas Personal Auto Policy.

The Court notes that the cases relied upon by the Plaintiff in her Response to Defendant's Motion for Partial Summary Judgment present the factors which are traditionally examined in ascertaining residency for venue purposes, as opposed to interpreting insurance coverage. Nevertheless, this Court, for the sake of completeness, will evaluate these residency factors.

■ The Court reiterates that there is a distinction between a domicile and a residence. Again, while a person may have only one domicile, a person may have more than one residence. *Cauble v. Gray, supra.* The Court will first address the factors used to determine domicile. The elements of the legal concept of domicile are twofold: (1) an actual residence; (2) in conjunction with an intent to make it a permanent home. *Cauble v. Gray, supra; Snyder v. Pitts,* 241 S.W.2d 136, 139 (Tex.1951). After careful review of the pleadings, it is clear to this Court that the legal domicile of Dr. and Mr. Halloran

was in Houston, Texas. Dr. Halloran testified under oath that her domicile was not in New York, but rather was in Houston. (Sworn Statement of Vickey C. Halloran, M.D., at 105, lines 9–12, 108, lines 2–6). Moreover, Mr. Halloran testified under oath that Houston was the primary home of he and his wife. (Sworn Statement of James F. Halloran, at 20, lines 17–19). The Court also finds the following facts to support the conclusion that the Hallorans had their domicile in Houston: Dr. and Mrs. Halloran were registered to vote in Houston, Texas; Dr. Halloran did not pay state income taxes in New York; and the Hallorans repeatedly represented their Houston address to be their primary home.

■ The Court observes that the meaning of the word "residence" envisaged in the insurance policy is more similar to the legal meaning of domicile. This Court views the interpretation of "residency" for purposes of obtaining in-state tuition to be analogous to the issue at bar. For the purpose of determining in-state *resident* tuition rates, the United States Supreme Court upheld a *domicile* requirement. *Sturgis v. Washington,* 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464 (1973); *Starns v. Malkerson,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971) Hence, residency unequivocally meant domicile for university tuition purposes. Similarly, "residence" within the context of the insurance policy can be understood to mean "domicile."

To interpret "residence" as stated in the policy to mean otherwise would perpetrate a fraud upon the entire insurance structure. Expressed in the most rudimentary terms, the purpose of the insurance industry is to spread the risk of personal injury or property damage across a diverse population. To accomplish this objective, the insured population must pay premiums which accurately reflect their proportionate share of exposure to risk.

As suggested above, a fraud would result if individual insureds were permitted to maintain one residence for insurance purpose and a different residence for domiciliary purposes. The insured could easily designate his or her residence for insurance purposes

to be in a relatively "safe" or "low risk" location, while the insured actually maintained a domicile in a relatively "unsafe" or "high risk" locale. The unfortunate consequence of such a scheme would be that an insured individual's coverage under the policy would be disproportionate to the insured's actual exposure to risk.

While this Court is of the opinion that "residence" has a meaning more similar to the legal concept of "domicile," this Court will, in the interest of being thorough, address the requisite elements for residency. The elements of a second residence away from a domicile are: (1) a fixed place of abode within the possession of the concerned individual; (2) which is occupied or intended to be occupied consistently over a substantial period of time; and (3) which is permanent rather than temporary. *Weisenburg v. Teleprompter Corp.*, 605 S.W.2d 737, 739 (Tex. Civ.App.—Dallas 1980; *Petty v. Petty*, 592 S.W.2d 423, 426 (Tex.Civ.App.—Dallas 1979); *Mijares v. Paez*, 534 S.W.2d 435, 436 (Tex. Civ.App.—Amarillo 1976); *Snyder v. Pitts*, 241 S.W.2d 136, 140 (Tex.1951).

Applying the three-prong test for residency, the Court notes that Dr. Halloran does indeed satisfy the first prong of the test. Dr. Halloran is the legal owner of the Brooklyn house, which is a fixed place of abode. However, Dr. Halloran does not satisfy the second prong of the test because she did not occupy the Brooklyn house consistently over a substantial period of time. Although Dr. Halloran may have spent between forty to fifty days of the year at the Brooklyn address, the visits were sporadic and for short intervals of time. Finally, since Dr. Halloran did not occupy the Brooklyn house consistently for substantial periods of time, her occupancy was necessarily temporary rather than permanent; therefore, she fails the third prong of the test.

The Court is genuinely moved by Dr. Halloran's evident devotion to her mother. Dr. Halloran has certainly assumed a tremendous responsibility in undertaking to provide financial and emotional support for her mother. Despite Dr. Halloran's benevolent motives for purchasing and maintaining the Brooklyn house, her actions, representations, and testimony fail to satisfy the three-prong test established for determining residency. This Court finds that Dr. Halloran did not maintain a second residence in the Brooklyn house. Hence, Plaintiff was not a resident of the same household as Dr. Halloran, and therefore the Plaintiff may not recover under the Texas Personal Auto Policy.

Drawing all justifiable inferences in the Plaintiff's favor, this Court finds that there is no genuine issue of material fact; thus, Defendant is entitled to judgment as a matter of law.

## IV. Conclusion

The Court would like to take this opportunity to commend Plaintiff's Counsel on his ability to advance well-articulated, novel arguments. This Court welcomes the good-faith efforts of Plaintiff's counsel to strive for the extension of the law. Regrettably, Counsel's laudable endeavors cannot properly be elevated to the status of legitimacy.

For the reasons mentioned above, Defendant's Motion for Partial Summary Judgment is **HEREBY GRANTED.** Furthermore, the parties are **ORDERED** to file nothing further on this issue in this court, especially Motions to Reconsider or the like, *unless* they can present *compelling* and *relevant* new evidence or legal authority which they could not, through the exercise of due diligence, have presented upon original submission of this Motion. *Any and all* further relief on this issue shall be sought in due course from the United States Court of Appeals for the Fifth Circuit. The parties shall each bear their own costs incurred herein to date.

IT IS SO ORDERED.