181 So.2d 835 (1965)
Doris Barton TISON et al., Plaintiffs-Appellees,
v.
The FIDELITY AND CASUALTY COMPANY OF NEW YORK et al., Defendants-Appellants.
No. 10497.
Court of Appeal of Louisiana, Second Circuit.
December 21, 1965.
Rehearing Denied January 26, 1966.
*837 Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, for appellants.
Davenport, Farr & Kelly, Monroe, for intervenor Northern Ins. Co. of New York.
Martin S. Sanders, Jr., Winnfield, Thomas & Friedman, Natchitoches, for appellees.
Before HARDY, GLADNEY and AYRES, JJ.
GLADNEY, Judge.
This suit by the widow and minor daughter of S. P. Tison seeks recovery of damages from the Fidelity and Casualty Company of New York, the liability insurer of a single engine airplane owned and operated by C. C. Wallace. The plane crashed November 25, 1962 in Lincoln Parish killing Wallace and Tison, who was a guest passenger. The defendant insurer has appealed from an adverse judgment and appellees have answered the appeal asking for an increase in quantum.
Certain facts preceding the fatal flight are pertinent for proper understanding of the issues presented. Paw Paw Island, situated in the Mississippi River near Vicksburg, was the point of departure of the airplane with Shreveport as its destination. After participating in several days of deer hunting on the island Wallace and Tison were returning to their homes. Early that morning, the last day of the hunt, all of the hunters in the group had taken their stands but as the day wore along they returned to the camp at different times. Wallace came in about 8:30 A.M. but Tison did not return until about 1:30 P.M. and following his return to camp he packed up his equipment for his journey home. Prior to the departure of the plane at 3:35 P.M. Wallace consumed a number of drinks of whiskey which those present estimated contained about twelve ounces of alcohol. This evidence is not controverted by appellant. There is no evidence that Tison upon his return to camp actually saw or observed Wallace drinking and the testimony of witnesses clearly establishes that Wallace exhibited no visible signs of intoxication.
At takeoff time good flight weather prevailed at the island. The plane rose smoothly, circled the field and headed westward for Shreveport. It was apparently on its proper course when it reached a point near Monore from which Wallace communicated by radio with Harold V. Odom of the control tower at Selman Field, and reported he was flying at 8500 feet between layers of clouds, the base of the layer above being about 10,000 feet and the top of the lower layer at about 6000 feet altitude. Although the ground was not visible to Wallace then, the flying conditions placed him well within the limits of visual flight rules as prescribed by Federal Aviation Agency regulations.[1] There was no further radio *838 contact between Wallace and the ground after the airplane passed Monroe, and the record contains no evidence with respect to visibility near the 8500 foot level immediately preceding the crash of the plane which occurred at 4:10 P.M. Although the weather may have afforded clear visibility for Wallace at a high altitude just preceding the crash, flight conditions near the ground were unfavorable and rapidly changing for the worse. S. L. Stuckey, a flight instructor at Ruston, Louisiana, testified that throughout the afternoon at the Ruston airport the ceiling was between 200 and 500 feet and those conditions prevailed at the scene of the crash where he arrived shortly after it occurred. At approximately the same time Wallace was passing Monroe at least two other pilots were flying west but below the lower layer of clouds observed by Wallace and these pilots after proceeding a short distance west of Monroe found the ceiling so close to the ground they returned to Monroe where they landed to await a change in weather conditions.
On the following morning after the accident Peter Pompetti of Fort Worth, an air safety investigator for the Civil Aeronautics Board, made an investigation and report of his findings relating to the accident. Wreckage from the plane was found scattered over a wide area with the engine imbedded in the ground under circumstances which indicated that the plane had come apart in flight. In the Pompetti report statements by witnesses who observed the plane near the scene of the crash reported the aircraft was descending from the clouds at a high rate of speed in uncontrolled gyrating rolls to the left and disintegrating as it descended. The aircraft impacted with the ground while inverted and bounced twenty feet disintegrating further. The examination of the wreckage revealed the aircraft had sustained multiple in flight structure failures; that the propeller was rotating under power and the engine was capable of normal operation at the time of impact with the ground. There was no evidence of malfunction or failure of the engine or control system prior to the impact. Pompetti did not determine the cause of the loss of control by the pilot and reported he did not know what happened. Wallace possessed a private pilot's certificate for a single engine, land rating airplane and a current medical certificate. It is indicated that the pilot had flown a single engine airplane better than 400 hours. He was not qualified for instrument flight. The evidence as compiled in the Pompetti report establishes that the crash resulted from the stresses occasioned by in flight overloads, that is, the plane was flown at such speed or under such conditions of stress that the stresses exceeded the capacity or the ability of the plane to withstand the same and therefore the plane broke apart in the air. It appears, therefore, that some action on the part of the pilot while the airplane was in flight caused its coming apart and its destruction. The trial judge commented that there was no evidence from which it could be determined whether or not Wallace lost control of his airplane while flying in the fair weather between the layers of clouds at 8500 feet or whether he lost control after descending to the layer of clouds that lay below him.
Defenses urged by appellant are twofold: First, that no liability has been incurred because of the effect of policy exclusions relating (a) to violations of the instrument flight rule, and (b) violation of FAA rules prohibiting the operation of an aircraft while under the influence of intoxicating liquor; and, second, that recovery is barred by reasons of the legal doctrines of assumption of risk and contributory negligence.
The exclusionary clause provides that the policy does not apply when the insured operates the aircraft in violation of any regulations of the Federal Aviation Agency *839 applicable to instrument flying.[2] It is argued that Wallace attempted to operate under instrument flight conditions without being certified to do so, all in violation of Section 43.65(d) of the Civil Air Regulations which reads:
"§ 43.65 Instrument flight limitations. No person shall pilot an aircraft under instrument flight rules or in weather conditions less than the minimums prescribed for flight under Visual Flight Rules unless he holds a currently effective instrument rating issued by the Administrator."
The evidence clearly discloses that Wallace never held a currently effective instrument rating issued by the Administrator. It is incumbent upon the insurer, however, in order to relieve itself from liability upon application of this clause to show that Wallace either piloted or attempted to pilot his aircraft under instrument flight rules or in weather conditions less than the minimum prescribed for flight under Visual Flight Rules. With respect to such proof the burden rests upon the insurer.
Serious doubt exists in our minds as to whether the cause of the crash was brought about by a violation of the rule which appellant seeks to invoke. After Wallace had reported to the control tower at Selman Field in Monroe the plane was not seen or heard from until it was in the "graveyard spiral" observed by several witnesses on the ground immediately prior to the crash. Appellant's argument asserts Wallace was attempting to operate the aircraft under instrument conditions when weather conditions were below the minimum prescribed for flights under VFR. In their brief counsel have conceded that at the time Wallace was in contract with the control tower of Selman Field he was flying under weather conditions as prescribed for flights under VFR. Counsel argues, however, that even though it be assumed Wallace, while flying, had remained 1,000 feet vertically above the cloud layer below him and 500 feet vertically below the cloud layer above him and had remained at least 2000 feet horizontally from any cloud formation and would have been continuing a VFR operation under VFR conditions, the record does not show with certainty, the precise conditions of visibility and ceiling up to 10,500 feet at the spot of the impact of the plane. And from these related circumstances it is inferred that Wallace ran into "a situation of instrument conditions" with which he was not competent to cope even when not under the influence of alcohol, and in order to get from the top of the overcast to the ground where he crashed, Wallace had to violate the VFR and get closer to the layer of clouds beneath him than the minimal vertical distance of 1,000 feet required by Regulations Section 60.30 for he had to go through that cloud layer in violation of the Regulation applicable to instrument flight. Non Sequitur. The fallacy of appellant's argument is that no one knows what occurred to cause the aircraft to get beyond the control of the pilot. There is no evidence in the record to indicate the pilot voluntarily descended into the cloud layer prior to the crash nor is there anything to indicate that he attempted instrument flying. The burden of proof rests upon appellant to show that the violation of the regulation concerning instrument flying did occur. This it has not shown to our satisfaction.
*840 It is urged also that recovery under the policy was voided by reason of a Civil Aviation Regulation Section 43.45. This provision provides that no person shall pilot an aircraft while under the influence of intoxicating liquor.[3] With respect to the violation charged it is further contended that such operation was strictly in violation of Wallace's pilot certificate which declares that Wallace: "* * has been found properly qualified to exercise the privileges of a private pilot." The exclusion clause in effect states the policy does not apply to any insured who operates the aircraft in violation of its Federal Aviation Agency airworthiness certificate or in violation of the terms of any Federal Aviation Agency pilot certificate. This clause does not specifically apply to the operation by a pilot while under the influence of intoxicating liquor, nor do the terms of the pilot's certificate. Manifestly, the exclusion clause does not embrace all violations of FAA rules with the intention of avoiding liability in every case where there may be some violation of the rules. We construe the clause as having application only to violations of the regulations specifically referred to therein. Under jurisprudential rules of construction the provisions of a contract of insurance must be construed strictly against the insurer and in favor of one who claims the benefit of such a contract. After giving application to such rules we conclude that the defense predicated upon a violation of FAA regulation by Wallace in operating his plane while under the influence of alcoholic beverages is not meritorious. It is our finding appellant has failed to establish, by a preponderance of the evidence, its defenses based on violations of FAA regulations.
Payment under the policy is resisted by appellant on the further ground that the deceased, Tison, assumed the risk of and was contributorily negligent by accompanying Wallace on the flight to Shreveport with knowledge of Wallace's condition resulting from the excessive use of alcohol. The facts disclose that appellant has not established these defenses by a preponderance of the evidence. Primarily the question to be decided is whether or not Tison did or should have had knowledge that Wallace consumed an excessive amount of whiskey and was not in proper physical and mental condition to fly the plane to Shreveport. The witnesses who were in the presence of Wallace during the approximate four hours preceding the departure of the airplane from Paw Paw Island uniformly testified that Wallace exhibited no signs of inebriation. Hershel A. Hobson, the caretaker at the camp, who alone witnessed the takeoff, the other hunters having departed by automobiles, testified that the plane arose from the ground normally with a good takeoff, circled the field, and proceeded westward on its course towards Shreveport; and that he observed no effect of intoxicants on the physical appearance or actions of Wallace. Drs. James H. Eddy and H. M. Redetzki, qualified as experts upon the effect of alcohol, gave their opinion that undoubtedly Wallace had consumed sufficient alcohol, some twelve ounces, to affect his judgment and ability in the control of a complicated mechanism such as an aircraft. These witnesses agreed that the quantity of alcohol consumed by Wallace would more seriously affect him when he attained an altitude of 8,000 feet or more for at such an altitude there is a diminution in the oxygen supply and this scarcity of oxygen, coupled with the alcohol in the blood, causes greater affect than might be *841 the case where the individual remains on the ground. The logical conclusion from the testimony of the witnesses who observed Wallace prior to his takeoff coupled with the expert testimony of Drs. Eddy and Redetzki is that Tison did not observe any demeanor on the part of Wallace prior to leaving the ground to indicate he was not in good physical and mental condition. The evidence therefore does not sustain the defenses of assumption of risk and contributory negligence.
Neither of the parties to this suit are satisfied with the awards for damages as made by the trial court. Plaintiffs in their answer to the appeal complain that these awards are inadequate and the appellant holds that such awards are excessive. The trial court gave judgment in favor of Mrs. Doris Barton Tison for the sum of $71,664.00 and awarded $25,000.00 to Sandra Kay Tison, the minor daughter. The awards were not itemized. At the time of his death, Tison was 41 years of age with a life expectancy of 28 years. He provided his wife and only child with every means for the enjoyment of life and his annual average earnings were close to $10,000.00 a year. Tison was a good husband and father and his death unquestionably rested heavily upon his widow and minor daughter. After her husband's death, with a substantial diminution in the family income, Mrs. Tison was obliged to give up occupancy of her $25,000.00 home and live somewhat more modestly. The daughter was approaching the age for attendance at college which unquestionably would result in substantial expenses. We have carefully weighed these and other circumstances which have affected the family of the deceased and are of the opinion that the award to Mrs. Doris Barton Tison as made by the trial court should be increased to $101,664.00, and the award to Sandra Kay Tison should remain as granted.
Appellees further complain that the trial court failed to assess adequate fees for the two expert witnesses who testified in the case. The trial court fixed these amounts at $150.00 for Dr. Redetzki and $100.00 for Dr. Eddy. As a rule determination of witness fees rests largely within the discretion of the trial court and in this instance we find no abuse of his discretion.
For the foregoing reasons the judgment of the trial court is amended by increasing the award in favor of Mrs. Doris Barton Tison to $101,664.00, and as amended the judgment is affirmed at appellant's cost.
NOTES
[1] "VISUAL FLIGHT RULES (VFR)

§ 60.30 Ceiling and distance from clouds. Aircraft shall comply with the following requirements as to ceiling and distance from clouds:
(a) Within control zones. Unless authorized by air traffic control, aircraft shall not be flown:
(1) Less than 500 feet vertically under, 1,000 feet vertically over, and 2,000 feet horizontally from any cloud formation, or
(2) Beneath the ceiling when it is less than 1,000 feet.
(b) Elsewhere. (1) when at an altitude of more than 700 feet above the surface, aircraft shall not be flown less than 500 feet vertically under, 1,000 feet vertically over, and 2,000 feet horizontally from any cloud formation; (2) when at an altitude of 700 feet above the surface or less, aircraft shall not be flown unless clear of clouds."
[2] This clause under the heading of Exclusions reads:

"This policy does not apply:
* * * * *
"(e) to any Insured who operates or who permits the operation of the aircraft:(1) in violation of its Federal Aviation Agency Airworthiness Certificate or operational record or in violation of the terms of any Federal Aviation Agency Pilots Certificate; (2) in violation of any regulations of the Federal Aviation Agency applicable to acrobatic flying instrument flying, repairs, alterations and inspections, night flying, minimum safe altitudes and student instructions: * * *"
[3] "§ 43.45. Use of liquor, narcotics and drugs. No person shall pilot an aircraft or serve as a member of the crew while under the influence of intoxicating liquor or use any drug which affects his faculties in any manner contrary to safety. A pilot shall not permit any person to be carried in the aircraft who is obviously under the influence of intoxicating liquor or drugs, except a medical patient under proper care or in case of emergency."