UNITED STATES FIRE INSURANCE
COMPANY, Petitioner,

v.

MARR'S SHORT STOP OF TEXAS,
INC., Respondent.

No. C–1929.

Supreme Court of Texas.

April 4, 1984.

Rehearing Denied Nov. 28, 1984.

Baker & Botts, Larry F. York, Austin, L.W. Anderson, Dallas, for petitioner.

Byrd, Davis & Eisenberg, Tom Davis and Mike Davis, Austin, for respondent.

POPE, Chief Justice.

The question presented is whether the pilot of an airplane that crashed near New Orleans shortly after takeoff, killing all four persons aboard, was properly rated for the flight within the coverage of the aviation liability insurance policy. United States Fire Insurance Company filed this suit against Marr's Short Stop of Texas, Inc. for declaratory judgment and for the recovery of the money it had paid the insured's lienholder. The trial court, after a jury trial, rendered judgment for the plaintiff insurer. The court of appeals reversed the judgment of the trial court holding that Marr's Short Stop was covered. 643 S.W.2d 514. We reverse the court of appeals' judgment and affirm the judgment of the trial court.

At the time of the fatal crash, Ronald Marr was piloting the plane. Our decision turns upon the application of these sections of the insurance policy:

This policy does not apply ... to any occurrence or to any loss or damage occurring while the aircraft is operated in flight by other than the pilot or pilots set forth under Item 7 of the Declarations:

\* \* \* \* \* \*

7. PILOT CLAUSE: Only the following pilot or pilots holding valid and effective pilot and medical certificates with ratings as required by the Federal Aviation Administration for the flight involved will operate MARR.

United States Fire paid a claim for $213,-956.81 asserted by the bank that held a lien on the destroyed plane. It then brought

this suit against Marr's Short Stop, contending that the pilot, Marr, was not properly rated as required for coverage under the policy. The trial court submitted two special issues. The jury refused to find that weather conditions that existed at the beginning of the flight were IFR (Instrument Flight Rules). The jury answered the second issue affirmatively, that is, "at the inception or beginning of the flight ... Ronald Eugene Marr knew that he would be flying in IFR weather conditions."

The court of appeals reversed the trial court's judgment that was based upon the second jury finding, holding that the first jury issue was determinative, and the second jury issue and finding were immaterial under this court's prior decision in *Glover v. National Insurance Underwriters*, 545 S.W.2d 755 (Tex.1977). The court of appeals, however, held that the evidence was legally and factually sufficient to support both jury findings. We agree that there was evidence that supported the findings.

We granted the application for writ of error to review the court of appeals' disregard for the second finding. Marr's Short Stop, by cross-point, asserts the absence of any evidence to support the finding that Marr knew at the inception of the flight that he would be flying in IFR weather conditions. Since the factual background is essential to our discussion of both Marr's Short Stop's cross-point and also United States Fire's point, we shall first discuss the facts.

Ronald Marr, the deceased pilot, was certified for flying under visual flight rules, termed VFR. Visual flying must be in weather conditions that permit one to see the ground or horizon. The minimum requirements for VFR weather conditions within an airport traffic area that is controlled by the tower are a 1,000 foot ceiling and three miles of horizontal visibility. The controlled space of an airport is the area within a five mile radius of the airport

and within 3,000 feet from the ground. *See* Federal Aviation Regulations, 14 C.F.R. § 91.105 (1983). Weather conditions that are below these minimum standards are classified under instrument flight rules, termed IFR.

Ronald Marr was not rated for instrument flight. On the morning of September 20, 1979, Marr planned a return flight from New Orleans to Mineral Wells, Texas, in his company's Piper twin engine plane. The weather was cloudy and rainy. He called the Flight Service Station at 7:45 a.m. for weather briefing and was told that the forecasts between New Orleans and the Dallas-Fort Worth area were governed by IFR. At the New Orleans Lakefront Airport, however, the weather was suitable for VFR flight. The controller told Marr that it would start getting better to the west by noon but "It's supposed to get worse here," meaning at New Orleans.

At 9:55 a.m., Marr obtained his next weather briefing. The route from New Orleans northwest to Dallas was reported as IFR with heavy embedded thunderstorms, but clearing to the south. Marr learned also that conditions to the west at Lake Charles had improved. Marr decided to fly west instead of northwest. That route, according to the weather briefer, had "some light rain showers, some IFR conditions every now and then and maybe a cell or two." The tops of the clouds were about ten thousand feet.

Marr filed an unauthorized IFR flight plan in violation of Federal Aviation Regulations, 14 C.F.R. § 61.3(e) (1983),[1] and it was on the basis of that plan that he would receive clearance from the airport by way of Lake Charles, Waco, and Fort Worth Meacham Field. The controllers at the takeoff from New Orleans and his destination at Meacham Field did not know that Marr was certified only for visual flying.

1. Federal Aviation Regulations, 14 C.F.R. § 61.-3(e) (1983) provides in part that:
    Instrument Rating. No person may act as pilot in command of a civil aircraft under instrument flight rules, or in weather conditions less than the minimums prescribed for VFR flight unless—
    (1) in the case of an airplane, he holds an instrument rating...

After filing his unauthorized IFR flight plan, Marr was assigned an electronic path, Victor 20, to Lake Charles; and another path, Victor 15, to Waco. One who is properly rated can fly those routes without seeing the ground, and he can stay in continuous contact with Air Traffic Control from takeoff to his destination.

Important new weather data was transmitted to all pilots monitoring Lakefront Tower while Marr was taxiing to a runway at 10:31 a.m., just seventeen minutes before takeoff. The traffic controller issued a convective SIGMET warning of embedded thunderstorms with tops to 50,000 feet along his flight path. A "SIGMET" is a warning of a significant meteorological phenomenon. A "convective SIGMET" is a warning to all pilots for the safety of aircraft when there is violent weather such as danger of tornadoes, lines of thunderstorms, or embedded and other types of thunderstorms. An embedded thunderstorm is one that exists in an area that is covered and concealed by clouds.

At 10:37 a.m. the special Flight Service observation log showed that the weather around Lakefront Airport had deteriorated to one mile visibility and 1000 feet overcast with heavy rain and fog. Conditions were then classified, not as VFR, but as special VFR, but one could fly with permission. Special VFR conditions refer only to the airport traffic area. As forecast at the first weather briefing to Marr, the conditions had grown worse in the New Orleans area.

Marr was cleared for his IFR flight at 10:48 a.m. While climbing to his assigned altitude of 10,000 feet for his westbound flight, he immediately got lost. The controller discovered and advised Marr that he was headed eastward in the opposite direction of his assigned route. Marr attempted to correct his error, but the plane, after reaching an altitude of about 8,700 feet disappeared from the radar scope. Seventeen minutes after takeoff and about fifteen miles southwest of the airport, witnesses saw the plane flying almost straight into the ground. The weather was overcast and drizzling at the point of the crash.

Marr's Short Stop insists that all of the evidence of IFR weather conditions were along the direct path to Fort Worth that Marr chose not to take. It urges that there is no evidence of any IFR weather about which Marr knew on the alternate path, Victor 20, to the west. While it is true that by heading westward Marr could avoid much known IFR weather, there was evidence that he knew there were lesser but some IFR conditions through which he had to fly. The convective SIGMET warning of embedded thunderstorms with tops to 50,000 feet covered his route westward to Lake Charles. The jury had before it the undisputed fact that the deceased pilot misled the Flight Service and the tower by representing that he was IFR rated and thereby supplied the strongest evidence of his knowledge of IFR conditions. If Marr did not need IFR clearance, why did he seek it? Absent those conditions, there was no reason for him to violate the law by filing his IFR flight plan and taking an assigned electronic course, Victor 20.

The jury rightfully could reason that Marr knew the conditions through which he must fly, and his IFR flight plan was a way that he could be granted clearance. Whether he could have taken off without the IFR flight plan is not the point; Marr's filing the plan is a believable circumstance that he knew the weather conditions were IFR. He had to fly to his assigned route of 10,000 feet through clouds. He knew embedded thunderstorms were moving from the west and south of New Orleans and there was little chance to avoid them other than to fly through them. The purposes of flight instruments and specialized training for blind flying are to permit flight by those trained to overcome spatial disorientation that is inherent in flying non-visually. We agree with the court of appeals that there is evidence that supports the finding that at the inception of the flight, Marr knew he would be flying into IFR weather.

The court of appeals erred in its application of *Glover v. National Insurance Underwriters*, 545 S.W.2d 755 (Tex. 1977), by ignoring the finding that Marr, at the inception of his flight, knew he would be flying in IFR weather conditions. In *Glover* this court held that a court in deciding whether a pilot, to use the words of the policy, was "properly rated for the flight," must make the determination from the flight in its entirety. We held that we would not break "the flight" into segments, so that coverage flickered on and off as the plane moved from VFR to IFR conditions. We also held that the weather conditions that existed at the beginning of the flight should be examined to make the determination.

In *Glover*, the pilot took off from Odessa-Midland airport with a ceiling of 25,000 feet overcast. The pilot took off at 9:20 a.m. in VFR conditions destined for Eagle Pass. The stipulated facts included a report that the pilot had received a forecast of conditions near Del Rio. That forecast was for VFR weather by 10:00 a.m. The pilot in *Glover* flew in visual flying weather about one-third of the way to Eagle Pass and then ran into unexpected IFR conditions. The favorable conditions that had been forecast proved unfavorable and the pilot crashed. It was in that context that we held that we would characterize a flight as IFR or VFR by looking at the flight as a whole, rather than in segments. We held also that the time for the determinative decision is at the inception of the flight, citing *National Insurance Underwriters v. King Craft Custom Products, Inc.*, 368 F.Supp. 476 (N.D.Ala.1973), *aff'd per curiam*, 488 F.2d 1393 (5th Cir.1974).

We stated in *Glover*, in applying the inception rule, that the pilot "did not *know* when he took off that he was flying into IFR weather." 545 S.W.2d at 763. We have an opposite finding on that fact before us in this case.

The judgment of the court of appeals is reversed and that of the trial court is affirmed.

## ON REHEARING

SPEARS, Justice, concurring.

I concur with the result reached by the majority; however, I believe that the majority opinion perpetuates the confusion over the proper standard for determining IFR flights which was created by *Glover v. National Ins. Underwriters*, 545 S.W.2d 755 (Tex.1977).

In *Glover*, at least two separate tests for classifying a flight as IFR or VFR are set forth. One test involves an inquiry into whether the pilot actually knew that he would encounter IFR conditions. Although this test was dicta in *Glover*, the majority opinion has elevated it to a controlling level here. The second test in *Glover* stated that a flight would be determined by the weather conditions existing at the beginning of the flight. Within this test is the ambiguity of whether the "beginning" refers only to the weather conditions at the time and place of takeoff or to the conditions along the entire line of flight as viewed from information available at the beginning of the flight.

To resolve the confusion and to determine a reasonable construction of the pilot warranty clause, I would propose the following standard to determine the weather classification of "the flight."

The determination of whether a flight is IFR or VFR should be made by the trier of fact on the basis of weather reports and forecasts of the expected weather conditions along the entire plan of flight which were *available* to the pilot at the time and place of departure. If the forecasts indicate that the pilot must fly through IFR conditions to reach his destination, it is an IFR flight.

Obviously, if there is an expected IFR thunderstorm at the time and place of destination and this information is available at the time of departure, the flight should not be characterized as VFR, irrespective of what the weather is at departure. The pilot's knowledge should not be the controlling factor because the conditions of the

flight are controlled by the weather and not by the pilot's beliefs.

Although this standard implicitly places a duty on the pilot to seek available weather information, the pilot's coverage will not be suspended because of his failure to seek or reasonably interpret the information, but rather because of the existence of IFR conditions. Though an insurance policy is intended to cover even the pilot's own acts of negligence, all insurance policies have conditions and limits on coverage. A pilot's failure to realize that his policy excludes coverage in a given situation does not prevent the exclusion from operating, whether or not the failure to realize it was negligent.

I believe that the above standard should be used to determine the character of the flight. Using this standard, I would hold as a matter of law that under these facts, this was an IFR flight.

The dissenting opinion on rehearing by Justice Ray states that the issue of causation was raised by Marr's Short Stop and that the insurance company should be required to prove that the accident was caused, in whole or in part, by the IFR weather conditions in accordance with *Puckett v. U.S. Fire Insurance Co.*, 678 S.W.2d 936 (Tex.1984). I disagree with both of these assertions. First, I do not believe that the record shows that Marr's raised and preserved the issue of causation to prevent the exclusion from operating.

Second, I believe that in order to avoid an unambiguous exclusion in an insurance policy on public policy grounds, the claimant should have the burden to prove that his failure to comply with the terms of the contract in no way contributed to the loss. In *Puckett*, the parties stipulated that the crash was not caused by the insured's failure to have a valid airworthiness certificate; therefore, the question of burden of proof was not addressed. In that opinion, however, we stated:

> Puckett contends that allowing an insurance company to avoid liability *when the breach of contract in no way contributes to the loss* is unconscionable and

ought not be permitted. We agree. Here, the accident was caused by something—pilot error—unquestionably covered by the policy. It would be against public policy to allow the insurance company *in that situation* to avoid liability . . . .

*Id.* at 938 (emphasis added). In order for a claimant to avoid a properly raised and proven exclusion on the grounds of pubic policy, the claimant should have the burden of establishing that the situation is one which justifies the public policy exception recognized in *Puckett.*

KILGARLIN, J., joins in this concurring opinion.

ROBERTSON, J., withdraws his dissent of April 4, 1984, and joins the majority opinion by POPE, C.J.

RAY, Justice, dissenting.

I respectfully dissent. The holding of the majority is incorrect in two respects: first, it upholds a declaratory judgment when the movant failed to meet its burden of proof and second, the majority's holding implicitly overrules the test as set forth in *Glover v. National Insurance Underwriters,* 545 S.W.2d 755 (Tex.1977).

### Declaratory Judgment

In actions for declaratory judgment, courts will ignore the formal position of the parties and place the burden of proof upon the party asserting the affirmative of the controlling issues. *Ross v. American Radiator & Standard Sanitary Corp.,* 507 S.W.2d 806, 810 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.); 1 R. McDonald, *Texas Civil Practice* § 2.06 (rev. 1965). A review of the pleadings demonstrates that the plaintiff, United States Fire Insurance Company ("U.S.F.I."), bore the burden of proving Ronald Eugene Marr ("Marr") was not properly rated for the flight involved. If U.S.F.I. failed to meet its burden of proof on this issue, its motion for declaratory judgment must be denied.

The issue of whether Marr was properly rated for the flight involved was submitted

to the jury in Special Issue No. 1, which stated:

Do you find from a preponderance of the evidence that the weather conditions existing at the beginning of the flight in question when Ronald Eugene Marr and his passengers took off from Lakefront Airport on September 20, 1979, were IFR?

Answer "we do" or "we do not."

Answer: "We do not."

U.S.F.I. failed to obtain a favorable jury finding on its vital issue. The jury's finding on Special Issue No. 1 established that the weather conditions were VFR when Marr took off from Lakefront Airport. Marr was licensed for VFR conditions, and therefore, it is without question that Marr possessed the proper qualifications for the flight involved.

### The Glover Test v. the New Test

The test adopted by the majority overrules the *Glover* test, 545 S.W.2d 755. The holding in *Glover* clearly requires that a flight designation of VFR or IFR be determined by the weather conditions at the departure site. Our opinion in *Glover* specifically rejects pilot knowledge as the test. In direct contrast, the present test set forth in the majority opinion requires that a pilot's knowledge of the existence of IFR weather in the flight path determines the designation of a flight as IFR or VFR for purposes of insurance coverage.

In *Glover*, this court construed a pilot clause very similar to the one presently at issue. The pilot requested weather briefings at 7:55 a.m. for an anticipated departure time three to four hours later. The briefings recited the existence of IFR conditions at the departure site and along the flight path. When the conditions improved to VFR at the airport of departure, the pilot, who was rated only for VFR flight, took off. He then crashed in IFR conditions en route to his original destination.

After holding that the pilot clause was ambiguous, the *Glover* court addressed the problem of how to characterize a flight as an IFR or VFR flight. It is useful to note the methods of characterizing a flight which were mentioned in the *Glover* opinion but which that court chose not to employ. The court chose not to use a method of characterization which turned upon whether or not the pilot actually used his instruments, rather than his vision, to maintain the aircraft in its proper position during flight. *Id.* at 761–62. The court also chose not to characterize a flight as IFR or VFR by reference to the Federal Aviation Regulations. *Id.* at 762. Most importantly, the *Glover* court explicitly rejected the characterization of a flight as IFR or VFR, depending on the pilot's knowledge of weather conditions along his flight path or at his destination. *Id.* at 763.

After considering various methods of characterizing a flight as IFR or VFR, the *Glover* court held that a flight is to be characterized as a whole according to whether IFR or VFR weather conditions existed at the time and place of the flight's inception.[1] *Id.* at 762. In other words, if it is found that IFR weather conditions existed at the time and place of the flight's inception, then the entire flight is to be characterized as an IFR flight, and if it is determined that VFR conditions existed at the time and place of the flight's inception, then the entire flight is to be characterized as a VFR flight. *Accord, Northwestern Flyers, Inc. v. Olson Bros. Mfg. Co., Inc.,* 679 F.2d 1264 (8th Cir.1982); *see also, National Insurance Underwriters v. King Craft Custom Products, Inc.,* 368 F.Supp.

1. In response to the contention of United States Fire Insurance that this was not the holding in *Glover*, I note that my interpretation not only is supported by the majority opinion in that case, it is identical to the interpretation of the majority opinion by the dissenting justices. The dissenting opinion, written by Justice Sam D. Johnson and joined by Justice Pope, states:

It is important to follow the reasoning of the majority: first, in determining the character of the flight as VFR or IFR, it will be looked to as a *whole;* and second, that determination (of the whole) will be based on the conditions (VFR or IFR) at the inception of the flight *only.*

545 S.W.2d at 764.

476 (N.D.Ala.1973), *aff'd per curiam,* 488 F.2d 1393 (5th Cir.1974).

The following examples illustrate the problems which will result from applying the test delineated by the majority. Before takeoff, Pilot A, a non-instrument rated pilot, receives a weather forecast predicting that IFR weather conditions will exist when he arrives at his destination 500 miles away, but that weather conditions will be VFR between his point of departure and his destination. This is evidence to support a jury finding that Pilot A knew at takeoff that he would be flying in IFR weather conditions. Suppose the pilot takes off in VFR conditions, flies ten miles in VFR conditions, then crashes in VFR conditions. Under the present test implemented by the majority opinion, the flight would be characterized as an IFR flight for which the pilot was not properly rated since Pilot A knew at takeoff that he would be flying in IFR conditions. Thus, the insurance policy involved in this case would not cover the flight.

Pilot B, a non-instrument rated pilot, takes off in VFR weather conditions, encounters IFR weather conditions after flying twenty miles, then crashes in IFR conditions. It is conclusively established that all available weather forecasts predicted that IFR weather conditions would exist along Pilot B's flight path. Furthermore, it is conclusively established that Pilot B consulted no weather forecast before, during, or after takeoff. Thus, Pilot B, because he was so grossly careless, had no knowledge that he would be flying in IFR weather conditions. Under the test implemented by the majority opinion, Pilot B's flight would be a VFR flight for which he was properly rated, and the policy of U.S. F.I. would cover the crash.

In example #1, Pilot A was not covered by insurance because he consulted weather forecasts. In example #2, Pilot B was covered because he failed to consult weather forecasts. The new rule places a premium upon a pilot's voluntary ignorance of weather conditions along his flight path.

The *Glover* court rejected the pilot knowledge test because "very few pilots actually *know* when they take off what weather conditions they will encounter over two hours later." (Emphasis in original.) *Id.* at 763. Instead, the *Glover* court recognized the pilot only possesses an expectation, based on the available weather information, of conditions he will encounter. The court stated that a pilot knowledge test would necessitate inquiry into the reasonableness of the pilot's expectations based on the weather forecasts he received.

> Inquiries into the reasonableness of a person's actions might best be ignored in determining the coverage of an insurance policy designed to protect one from the consequences of one's own negligence, especially where the language of the policy does not clearly dictate such an inquiry.

*Id.* at 763.

In light of this language in *Glover,* the court of appeals in the present case correctly concluded that the jury finding on the second special issue was irrelevant for determining whether the flight was IFR or VFR. Special Issue No. 2 inquired whether Marr knew when he took off from Lakefront Airport that he would be flying in IFR weather conditions. The jury answered Marr did know he would be flying in IFR conditions.

Applying the majority's test to the present fact situation, the evidence would not support a finding of pilot knowledge. The majority seems to base its finding of knowledge by Marr that he would be flying into IFR conditions on the fact that Marr filed an IFR flight plan before departing the airport. However, expert testimony presented at trial established that filing an IFR flight plan does not signify the pilot knows he will be flying into IFR conditions. IFR flight plans often are filed when present and anticipated weather conditions are VFR to insure the pilot will be maintained on radar coverage throughout the flight.

The presumption of Marr's knowledge of IFR conditions also is based on the is-

suance of a convective SIGMET warning just before Marr took off from Lakefront Airport. A SIGMET is generally issued for a large area, for a long period of time. It is a forecast of possible or impending weather conditions in the area. A convective SIGMET is generally more specific and informative about phenomena such as turbulence and thunderstorms and, consequently, a more urgent warning of severe weather conditions. There is no evidence in the record to substantiate that Marr received the SIGMET warning. U.S.F.I.'s expert testified he believed there was some type of problem with Marr's plane radio. The control tower unsuccessfully attempted several times to contact Marr for verification that he had received his clearance. The tower personnel finally succeeded on the fourth attempt.

The only weather information received by Marr, as proved by the evidence presented at trial, consisted of the flight service briefings which showed IFR conditions on a direct flight path from New Orleans to Fort Worth, but VFR conditions along the alternate path (Lafayette, Lake Charles, Beaumont, Navasota, Waco). There is direct testimony in the record that Flight Service informed Marr of clearing at Lake Charles with some light rain showers, some IFR conditions "every now and then" and "maybe a cell or two" between Lake Charles and Lafayette.

The majority presumes the airplane crash resulted from Marr's contact with thunderstorm turbulence. The presumption is based on testimony by the air traffic controller monitoring the flight, that Marr stated, "we got it turned back around, we got off our course." Evidence presented at trial verified the presence of fifteen other planes in the same area, under control of the same controller and within the same time period as Marr. There was no report of turbulence by any of those pilots. Accurate reports of turbulence are obtainable only from pilots in the area because radar cannot detect air turbulence. The majority totally disregards the absence of any proof as to what actually caused the crash. Marr raised this point in his motion for rehearing

and supplied evidence of possible mechanical problems with the airplane itself instead of the pilot disorientation presumed by the majority. A conclusion by this court that the crash was caused by weather conditions is based on speculation, not the evidence presented at trial.

Marr has preserved the issue of causation for our review. In the trial court he objected to the submission of Special Issue No. 2 on the grounds that knowledge of the existence of IFR conditions was not an ultimate issue, would not support a judgment and should have inquired where Marr encountered the IFR conditions. Special Issue No. 2 merely presupposed that if Marr knew of IFR conditions, he operated his aircraft in them. U.S.F.I. obtained no fact finding on this issue. Without a fact finding that Marr operated his aircraft in IFR conditions, and that such conditions were causally related to the crash, U.S.F.I. has failed to establish any causal connection between the IFR conditions and the crash.

There simply is no evidence to establish that Marr encountered any weather conditions that caused him to lose control of his aircraft. Since Marr objected to Special Issue No. 2, the burden was on U.S.F.I. to obtain favorable fact findings that Marr encountered IFR conditions above the crash site and that such weather caused the crash. Insurance coverage should not be denied Marr unless U.S.F.I. proves that Marr encountered IFR weather and that his failure to have an instrument rating was causally related to the crash. Failure to have such a rating could not be the cause of the crash unless Marr actually encountered IFR weather. There can be no presumed fact finding that Marr actually encountered IFR weather in the face of Marr's objection to Special Issue No. 2. The fact that Marr's plane crashed is no evidence that Marr violated his VFR rating or encountered IFR weather. *Tison v. Fidelity & Casualty Co.*, 181 So.2d 835, 839 (La.Ct.App.1965).

If this court is going to characterize flights in the way set forth in the majority opinion, then it would seem reasonable to require a finding of a causal relationship between the IFR conditions and the crash. We recently have held in *Puckett v. United States Fire Insurance Co.*, 678 S.W.2d 936, 937 (1984), that a causal nexus must exist between the breach of an insurance policy and an airplane crash. The majority does not require the same finding be made in this case.

The majority has chosen to employ the pilot knowledge test when determining flight classification for purposes of insurance coverage. Furthermore, the majority has decided upon this test without any showing of causation between the pilot's knowledge or lack of knowledge and the crash. In so doing, the court has adopted precepts of negligence law for a cause of action arising out of contract construction.

I am opposed to the present test set forth in the majority opinion. This court, in *Glover*, has already spoken to the issues presented in this case. The majority opinion overrules our prior test. Nonetheless, even in light of this new test, I would remand the case to the trial court for the determination of whether a causal connection existed between the pilot's knowledge or lack thereof and the fatal crash.