**RANGER INSURANCE COMPANY, Appellant,**

v.

**James Lewis ROBERTSON, et al., Appellees.**

No. 13764.

Court of Appeals of Texas, Austin.

Feb. 12, 1986.

Rehearing Denied April 9, 1986.

C.C. Small, Jr. Small, Craig & Werkenthin, Austin, for appellant.

Mike Davis, Byrd, Davis & Eisenberg, Austin, for appellees.

Before SHANNON, C.J., and GAMMAGE and CARROLL, JJ.

SHANNON, Chief Justice.

This appeal stems from an airplane crash near Graford on December 5, 1974. Byron McKnight was the pilot and his wife, Amelda Ann McKnight, was a passenger. The flight had originated in Hobbs, New Mexico and was to terminate in Dallas. Both the pilot and the passenger perished in the crash.

## PROCEDURAL HISTORY

James Lewis Robertson, as executor of the wife's estate, sued the husband's estate for wrongful death in the district court of Travis County. The district court rendered summary judgment that the Texas doctrine of interspousal tort immunity barred the suit. The court of civil appeals affirmed the summary judgment. *Robertson v. Estate of McKnight*, 591 S.W.2d 639 (Tex.Civ. App.1979).

On November 12, 1980, the Supreme Court reversed the judgment, holding that the law of New Mexico concerning interspousal tort immunity should be applied.

The Supreme Court ordered the cause remanded to the district court "to proceed to trial on the merits in conformity with this opinion." *Robertson v. Estate of McKnight*, 609 S.W.2d 534, 537 (Tex.1980).

The husband's estate then filed its motion for rehearing. The Supreme Court overruled the estate's motion for rehearing *on January 14, 1981*. After the Supreme Court had delivered its opinion, but about one month before it acted on the motion for rehearing, counsel for both estates, without knowledge of counsel for the liability insurance company, announced to the district court that they had settled all claims asserted in the cause.[1] *On December 11, 1980*, the district court signed a consent judgment approving the settlement agreement of the parties and ordering that the wife's estate recover $275,000.00 from the husband's estate.

Thereafter, the representatives of the husband's and wife's estates sued the liability carrier of the husband's estate, Ranger Insurance Company, in the district court of Travis County to enforce the consent judgment. Ranger filed an independent suit seeking a declaratory judgment that it was not obligated to pay the consent judgment. The district court consolidated the two suits.

Ranger insisted that the consent judgment was void because it was rendered when the motion for rehearing was still pending in the Supreme Court. Nevertheless, after trial to the court, the district court rendered judgment that appellees recover $275,000.00 from Ranger. Ranger then perfected its appeal from that judgment to this Court.

This Court held that the district court was without jurisdiction to render the consent judgment and because the judgment on appeal was predicated upon the void consent judgment, it too was void. This Court set aside the judgment and dismissed

---

1. The executor of the wife's estate was represented by personal counsel as well as by counsel for the liability insurance company.

the appeal. *Ranger Ins. Co. v. Robertson,* 680 S.W.2d 618 (Tex.App.1984).

The Supreme Court granted Robertson's application for writ of error and in a *per curiam* opinion approved our holding that the district court was without jurisdiction to render the consent judgment and that the judgment predicated upon the consent was void. The Supreme Court also affirmed our judgment setting aside the void judgment and dismissing the appeal from that judgment. *Robertson v. Ranger Ins. Co.,* 689 S.W.2d 209 (Tex.1985).

The Supreme Court further noted that Ranger's declaratory judgment suit had been consolidated with Robertson's suit on the consent judgment. Although the district court rendered no declaratory judgment, it did file a conclusion of law that liability coverage existed for the husband's estate. The Supreme Court concluded that although the district court's judgment "did not deal specifically with these issues, *by implication,* the rendition of judgment against Ranger for the amount of the consent judgment constituted a rendition of judgment against Ranger in its declaratory judgment suit." *Id.* at 211 (emphasis added).[2] The Court then directed this Court to consider "the other points of error presented."

We now undertake to discharge the Supreme Court's directive. In 1976, Robertson, as executor of the wife's estate, sued James Brady, the administrator of the husband's estate, asserting that the husband's negligent operation of the aircraft proximately caused the death of his wife. After service of citation, appellee administrator forwarded the petition and citation to the liability insurer, making demand upon Ranger to defend the husband's estate. In the beginning, Ranger accepted coverage and proceeded with the unqualified defense of the lawsuit. Several months later, however, Ranger notified the administrator of the husband's estate that it had determined

to deny coverage and that any further defense or investigation of the lawsuit would be made only under a reservation of rights agreement. The administrator, however, demanded that Ranger either continue its unconditional defense or . withdraw from the lawsuit. Ranger refused to accept coverage and tender an unconditional defense to the husband's estate, but instead insisted upon a reservation of rights agreement. The administrator then demanded that Ranger remove itself from the defense of the lawsuit, and thereafter employed other counsel to defend the estate.

Subsequent to its initial denial of coverage and its withdrawal of the defense to the suit, Ranger renewed its tender of a defense under a reservation of rights agreement. The administrator, however, steadfastly refused to consent to Ranger's defense of the suit under a reservation of rights agreement and consistently demanded that the insurer undertake the unconditional defense of the suit. After the administrator employed other counsel, Ranger's counsel remained in the suit despite the administrator's efforts to exclude him.

As mentioned above, the administrator of the husband's estate and the executor of the wife's estate, without knowledge of counsel for Ranger, agreed to settle the tort suit for $275,000.00. On December 11, 1980, the consent judgment was rendered by the district court of Travis County approving the settlement agreement made by the parties.

In January, 1981, appellees filed suit in district court to enforce the consent judgment. In their trial petition appellees pleaded that at the time of the airplane crash Ranger had in force a liability insurance policy which protected the husband against liability for injury or death to passengers in the Piper aircraft. Appellees alleged further that although requested to do so, Ranger refused to pay the consent

**2.** The Uniform Declaratory Judgments Act, Tex. Rev.Civ.Stat.Ann. art. 2524–1 (1965), however, does not contemplate declaratory judgments "by implication." Instead, the trial court is duty-bound to specifically declare the rights of the

parties as to those matters upon which the parties join issue. *Calvert v. Employees Retirement System of Texas,* 648 S.W.2d 418 (Tex.App.1983, writ ref'd n.r.e.).

judgment rendered by the district court of Travis County. Appellees pleaded further that by the terms of its liability policy Ranger was responsible to them for the full amount of the consent judgment.

In its trial pleading, Ranger pleaded that the consent judgment did not bind it because (1) it was an agreed settlement of the claim without a written agreement between the insured, the claimant and the insurer, all in violation of the terms of the policy; (2) the judgment was the result of fraud, conspiracy, and collusion between the administrator and the executor; (3) there was no coverage under the policy because the fatal flight was made in IFR (instrument flight rules) conditions and the husband was not properly rated to fly under IFR conditions; and (4) the district court had no jurisdiction to render the consent judgment because, at the time of its rendition, an appeal from the judgment in the same cause was still pending in the Supreme Court. Ranger sought a declaration from the district court that it had no obligation to pay the consent judgment and that no coverage existed under its policy of liability insurance.

That Ranger had no obligation to pay the consent judgment was determined in *Ranger Ins. Co. v. Robertson*, 680 S.W.2d 618 (Tex.App.1984) and that holding was affirmed by the Supreme Court. *Robertson v. Ranger Ins. Co.*, 689 S.W.2d 209 (Tex. 1985). This holding will not be discussed further.

## COVERAGE OF THE FLIGHT

We now examine Ranger's contention that because its policy afforded no coverage of the flight, it had no obligation to pay under its policy. McKnight's plane crashed near Graford. At the time and place of the crash it was raining, foggy, and hazy. The visibility was one half-mile, and there was an indefinite two hundred foot cloud ceiling with the sky obscured.

Ranger based its denial of coverage on the allegation that the pilot was flying the plane in violation of the policy's "Pilot Warranty Clause." That clause provides:

Only the following pilot or pilots holding valid and effective pilot and medical certificates *with ratings as required by the Federal Aviation Administration for the flight involved* will operate the aircraft in flight ... (emphasis added).

Ranger contends that the district court erred in concluding under the facts of the case that McKnight was properly rated for the flight within the meaning of the policy's pilot warranty clause, thereby affording coverage for the flight.

Federal Aviation Administration Regulations recognize two general types of weather conditions: IFR (instrument flight rules) weather conditions and VFR (visual flight rules) weather conditions. VFR weather conditions, in turn, fall into two categories, basic VFR weather and special VFR weather. IFR weather conditions are those conditions less than the minimum weather conditions for VFR flight. Under visual flight rules, a VFR rated pilot may not operate an aircraft 1,200 feet or less above the surface, outside controlled airspace, unless flight visibility is at least one mile and the aircraft operation is clear of clouds. 14 C.F.R. § 91.105(a) (1985). Accordingly, when a pilot operates an aircraft in weather less favorable than these minimums, he is operating in IFR conditions and he violates Federal Aviation Regulations unless he has an instrument rating.

McKnight held a private pilot's certificate at the time of the crash which authorized him to operate the aircraft covered by the insurance policy, but he did not have an instrument flight rating.

Ranger contends that McKnight did not have the rating required by the F.A.A. "for the flight involved" because under the evidence the flight was IFR, hence there was no coverage under the policy. Appellees, on the other hand, claim that the decedent's husband had the rating required by the F.A.A. "for the flight involved," because under the evidence the flight was VFR, and therefore Ranger is liable under its contract of insurance.

The district court filed findings of fact and conclusions of law. With respect to the coverage aspect of the lawsuit, the court found:

. . . . . .

(9) At the inception of this flight no weather reporting station along McKnight's flight path was reporting weather conditions less than the minimum weather conditions prescribed for VFR flight.

(10) The weather conditions existing at the beginning of the flight were VFR weather conditions.

(11) Looking at the flight as a whole, it must be characterized as a VFR flight, and therefore, Byron McKnight was properly rated for the flight within the meaning of the pilot warranty clause.

(12) At the time of takeoff, when this flight began, it was possible for Byron McKnight, using available weather reports or forecasts, to fly a route which would completely avoid encountering any IFR weather conditions during this flight by flying below any cloud deck, by flying above any cloud deck, by deviating to the north around any IFR weather conditions that might exist, or by finding a hole through the clouds prior to his approach to Dallas Love Field.

(13) Byron McKnight did not knowingly encounter any IFR weather conditions, and certainly he did not know at the flight's beginning that he would be forced to operate his aircraft under any IFR weather conditions.

. . . . .

Based upon the findings of fact, the district court concluded that the language of the pilot warranty clause was ambiguous and, as such, must be construed liberally in favor of the insured and strictly against the insurer. Because the language of the pilot warranty clause is subject to two or more reasonable interpretations, the court

opined that the construction that affords coverage must be adopted. The court then determined that the husband was properly rated for the flight within the meaning of the pilot warranty clause and therefore coverage existed under the insurance policy.

Disposition of this aspect of the appeal depends upon whether the "flight involved" is regarded as IFR or VFR. If the flight were IFR, then the pilot did not possess the rating required by the F.A.A. to operate the aircraft, and there was no coverage. If, on the other hand, the flight were VFR, then the pilot had the rating required by the F.A.A. and coverage existed.

In *Glover v. National Insurance Underwriters,* 545 S.W.2d 755 (Tex.1977) and *U.S. Fire Insurance Company v. Marr's Short Stop of Texas, Inc.,* 680 S.W.2d 3 (Tex.1984), the Supreme Court endeavored to establish how actual weather conditions are tested against the federal regulatory limits to determine whether a flight is VFR or IFR for purposes of insurance coverage.

As we understand the majority opinions in *Glover* and *Marr's,* the VFR or IFR nature of a flight is determined by an examination of the weather information received by the pilot before take-off. If the pilot knew, from the weather information received, that he would have to fly through IFR weather to reach his destination, then the flight was IFR; otherwise, it was VFR. 680 S.W.2d at 6. The flight path should be examined as a whole, rather than in segments, so that insurance coverage does not flicker on and off as the IFR or VFR nature of the weather changes along the flight-path. *Id.*

In focusing on the weather information received by the pilot prior to take-off, one examines both the reported existing weather conditions along the flight path and the conditions forecast to exist at flight time. The Court in *Glover,* and in its restatement of the *Glover* holding in *Marr's,* focuses particularly on the weather forecast received by the pilot in *Glover* which indicated that the weather would clear to VFR

conditions by flight time, although the conditions were clearly IFR at the time the weather briefing was received. The Court in *Glover* ultimately held the flight was VFR based on this forecast, despite the fact that the forecast proved to be wrong and the prevailing IFR weather finally caused the plane to crash. The Court concluded that the pilot did not know at take-off that he would encounter the IFR weather because he relied on the incorrect forecast. By contrast, the Court in *Marr's* held that the pilot there knew that he would encounter IFR weather based on the weather forecasts he received and on his filing an IFR flight plan.

Accordingly, the pivotal finding of fact in the present appeal is number thirteen in which the district court determined that the pilot did not know at take-off that he would be forced to operate his aircraft under IFR weather conditions. If finding thirteen is supported by the record, then the flight was VFR, and the pilot was properly rated and coverage existed.

Ranger asserts that finding thirteen is supported by no evidence or insufficient evidence. In determining a "no evidence" point of error, it is proper to consider only that evidence most favorable to the finding and to disregard entirely evidence which is opposed to it or is contradictory. *Renfro Drug. Co. v. Lewis*, 235 S.W.2d 609 (Tex. 1950); *Cartwright v. Canode*, 106 Tex. 502, 171 S.W. 696 (1914). In reviewing factual sufficiency points of error, the court considers all of the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d 660 (Tex.1951).

There is not much dispute concerning the weather information the pilot received prior to take-off, although the meaning and interpretation of this weather information is contested. McKnight received two weather briefings prior to take-off, one at 12:30 P.M. and another at 1:23 P.M. In these briefings, the pilot received "Sequence Weather Reports" (current conditions at noon and 1:00 P.M.) for Hobbs, Midland, Abilene, Mineral Wells, and Dallas. None of these reported current IFR conditions at noon or 1:00 P.M., but these reports were limited to the weather conditions observed at the various airports, and they reported conditions which existed several hours before the crash.

McKnight also received various weather *forecasts*, which included "terminal forecasts" for Abilene, Midland, and Dallas airports, and an "area forecast" for north and northwest Texas. The terminal forecasts for Abilene and Dallas predicted marginal VFR weather, deteriorating later in the day in Dallas. One of the area forecasts warned:

> Scattered showers and thunderstorms vicinity the cold front after 3 PM with tops to 30,000 feet. Ceilings frequently below 1000 feet in showers ... Outlook ... VFR west and IFR east becoming VFR after 8 AM Friday ...

McKnight's flight path lay across the cold front and into the area forecast as "Outlook ... IFR east ..."

Finally, McKnight's pre-take-off weather briefing included two AIRMETS, reports of dangerous weather by other pilots to the weather service. AIRMET Charlie 3 warned of "strong low level winds," while AIRMET Alfa 5 reported "ceilings frequently below 1000 feet and visibility frequently below 3 miles in precipitation and/or fog" continuing beyond 6:00 P.M. During the course of each of the two reports, McKnight received a warning from the weather station that "VFR not recommended."

Ranger introduced into evidence the crash report prepared by the National Transportation Safety Board. The Board's report summarizes the weather briefings which McKnight received. The weather briefing, so summarized, is that "pilot advised VFR flight not recommended." The report then summarizes the *en route* briefing received by McKnight as "weather in Mineral Wells, Fort Worth, Dallas, Texas, area was IFR." These shorthand accounts of the weather briefings suggest that the pre-take-off briefings reported only "not-

quite-IFR" or marginal VFR weather, and that McKnight did not receive an actual "full" IFR report until he was *en route*.

Nonetheless, National Transportation Safety Board inspector Finch, who prepared the crash report, testified by deposition at trial:

The weather briefings that he [McKnight] was given in Roswell, New Mexico, indicated that instrument flight conditions would be encountered en route; and the one he got in Midland, Texas, also indicated that there were instrument weather conditions to be encountered.

Aside from the National Transportation Safety Board's crash report and Finch's accompanying deposition testimony, Ranger presented two pilots who testified that they would interpret the weather reports McKnight received as indicating IFR weather. Robertson introduced no expert testimony to the contrary, although he did try to shake the pilot's conclusions on cross-examination. The district court apparently chose to disbelieve the experts and concluded that Ranger failed to meet its burden of proof on the coverage exclusion issue.

The "clear of clouds" requirement of the Federal Regulations, 14 C.F.R. 91.105(a), is a crucial part of the VFR definition since vision would be lost while flying through a cloud and the flight could no longer proceed on visual flight rules (VFR). The "clear of clouds" requirement necessarily implies that a flight clear of clouds will be possible under the forecast weather conditions which, in turn, depends on the extent and height of the cloud cover. The pre-take-off weather reports and forecasts for Dallas and Mineral Wells indicated an overcast sky for those areas (*i.e.*, more than nine-tenths of the sky obscured by clouds). The only way McKnight could have stayed "clear of clouds" was to have flown below this solid cloud layer. Finding of fact twelve that McKnight could have flown above the clouds and then found a hole in the clouds to come back down is questiona-

ble. Finding of fact twelve, however, is not critical to the resolution of the appeal.

Because McKnight would have to fly below the clouds, the cloud ceiling was important. The ceiling is the height of the cloud layer above the earth. If the ceiling is too low, the pilot will not be able to fly underneath it. When the ceiling is zero, the clouds are touching ground.

In determining whether McKnight thought that he could fly below the cloud deck, the district court should have considered 14 C.F.R. § 91.79(c) (1985). Section 91.79(c) provides that pilots in uncongested areas must maintain an altitude of at least 500 feet above the land surface. Although Robertson claims that this has nothing to do with VFR requirements, it seems plain that the flying regulations should be read as a whole so that a pilot must be both 500 feet above the surface and clear of clouds to fit the VFR minimums. Hence, a cloud ceiling of 500 feet or less would make VFR flying impossible.

The other consideration affecting whether McKnight thought he could fly under the cloud deck "clear of clouds" is the cloud ceiling reports and forecasts he received prior to take-off. The north Texas area forecast McKnight received predicted ceilings generally 1000 to 2500 feet, except in the vicinity of the cold front after 3 PM, when ceilings would be "frequently below 1000 feet in showers. . . ." Airmet Alfa 5 predicted "ceilings frequently below 1000 feet and visibility frequently below 3 miles in precipitation and/or fog" for the Mineral Wells area (where McKnight crashed).

In sum, the weather reports and forecasts available to McKnight before take-off indicated the probability of IFR weather along McKnight's flight path. Both the advisory language in the reports ("Outlook . . . IFR east"; "VFR not recommended") and the cloud ceiling forecasts indicated that McKnight would not be able to stay "clear of clouds" under visual flight rules.

Nonetheless, the weather information could be interpreted as marginal VFR rather than IFR, particularly if visibility is emphasized. Neither the current weather re-

ports nor the forecasts McKnight received before take-off indicated visibility below one mile, which is the VFR minimum under the federal regulations.

Were we the trial court, we would probably find under this record that McKnight knew before take-off that he would encounter IFR weather conditions in his flight path and we would conclude that he was not properly rated for the flight within the terms of the policy exclusion. However, it is basic that a reviewing court may not substitute its view of the facts for that of the fact-finder. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951); *Alley v. Booth,* 16 Tex. 94, 95 (1856). There is sufficient evidence in the record to support the district court's finding number thirteen. The points of error are overruled.

### ESTOPPEL

In addition to determining that coverage existed under the pilot warranty clause, the district court found as a fact that Ranger was estopped from denying coverage because it undertook the defense unconditionally for a period of some seven months before tendering the defense back to the administrator of the husband's estate. *Farmers Texas County Ins. Co. v. Wilkinson,* 601 S.W.2d 520, 522 (Tex.Civ.App. 1980, writ ref'd n.r.e.).

Ranger responds correctly that appellee Robertson did not plead estoppel. Ranger suggests that the court's finding is "meaningless in the absence of any pleading of estoppel as to coverage." Generally, a party must recover in the right in which he sues and upon proof of the facts asserted in his trial pleadings, and he cannot recover upon a right not asserted. *Starr v. Ferguson,* 140 Tex. 80, 166 S.W.2d 130, 132 (1942).

This Court must determine, however, whether the issue of estoppel was tried by consent pursuant to Tex.R.Civ.P. Ann. 67 (1979). Rule 67 permits an unpleaded issue to be treated as raised in the pleadings when it is tried by express or implied consent. Trial by consent is only

intended to apply in the exceptional case where it clearly appears from the record as a whole that the parties tried the unpleaded issue. Rule 67 is not intended to establish a general rule of practice and should be applied with care and not in doubtful cases. *Jay Fikes and Associates v. Walton,* 578 S.W.2d 885, 889 (Tex.Civ.App.1979, writ ref'd n.r.e.); *Foxworth-Galbraith Lumber Co. v. Southwestern Contracting Corporation,* 165 S.W.2d 221, 224 (Tex.Civ.App. 1942, writ ref'd w.o.m.).

This Court concludes that the issue of estoppel was tried by consent. We observe initially that although the determination of estoppel is found in the court's findings of fact, that determination is, in truth, a conclusion of law. The facts underlying the estoppel were stipulated by the parties and filed of record more than a month before trial. Because the facts supporting the estoppel were obvious and settled it was hardly necessary for the appellees to plead them. Because they were stipulated, facts were before the district court from which it could have justifiably found an estoppel.

### NO–ACTION CLAUSE DEFENSE

The balance of Ranger's points of error require a more detailed recitation of the facts concerning the handling of the underlying tort suit. Upon being served with the petition in the tort suit, the insured forwarded a copy of that petition to Ranger Insurance Company, and demanded a defense. On December 16, 1976, Ranger's representative acknowledged receipt of the insured's letter and stated that the defense of the suit had been turned over to attorney Larry Anderson of Dallas.

On July 27, 1977, Ranger's representative notified the insured "that the Ranger Insurance Company hereby disclaims liability under the policy described above as respects Byron McKnight" and sought a reservation of rights. On August 2, 1977, the insured notified Ranger that a defense under a reservation of rights was unacceptable and demanded that Ranger either continue its unconditional defense without

a reservation of rights or withdraw from the case.

On June 2, 1978, the trial court in the tort suit granted summary judgment in favor of the defense relying upon the Texas doctrine of interspousal immunity. The summary judgment was subsequently reversed by the Supreme Court. *Robertson v. Estate of McKnight, supra.* The Supreme Court's judgment was rendered and opinion handed down on November 12, 1980. The Supreme Court overruled the defense's motion for rehearing on January 14, 1981.

On December 11, 1980, the insured agreed to a settlement of the claim in litigation with appellee Robertson. Pursuant to this agreement, judgment was rendered in the tort suit under which McKnight's estate became liable to appellee Robertson for the sum of $275,000.00.

By letter of January 15, 1981 Ranger's representative advised the insured "that the Ranger Insurance Company will take over the defense of the above captioned lawsuit without any reservation whatsoever under the captioned policy." On January 26, 1981, the insured responded and forwarded for payment a copy of the judgment rendered in the tort suit. By letter of August 27, 1981, Ranger withdrew its offer to take over the unqualified defense of the case, advising the insured "that the company will assert whatever defense it may have against the enforcement of the agreed judgment as to it."

Ranger insists that the settlement of the suit by Robertson and the insured was in violation of the "no-action" clause of its policy. The no-action clause provides among other things that no action shall lie against the company

> until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement between the Insured, the Claimant and the Company. Any person or organization or the legal representative thereof who has secured such a judgment or written agreement shall

thereafter be entitled to recover under the terms of this Policy in the same manner and to the same extent as the Insured.

The consent judgment resulting from the settlement was not, claims Ranger, a "judgment against the insured after actual trial." Ranger asserts, accordingly, that it had no liability under the policy and that the district court erred in holding to the contrary.

This Court concludes that when Ranger denied coverage the no-action clause of the policy became inapplicable and the insured was entitled to assume control of the defense. Generally, an insurer's denial of coverage constitutes a breach of the insurance contract and a waiver of its right to insist upon compliance by the insured with policy provisions. *Womack v. Allstate Insurance Company,* 156 Tex. 467, 296 S.W.2d 233 (1956). Although the insurer ordinarily may insist upon compliance with its policy's no-action clause, the company has no right to do so after it has been afforded an opportunity to defend the lawsuit but has refused to do so based upon its mistaken belief that its policy provided no coverage. *Gulf Insurance Company v. Parker Products, Inc.,* 498 S.W.2d 676, 679 (Tex.1973).

Ranger argues that these legal principles are not applicable to it since it endeavored to remain in the suit under a reservation of rights agreement. Upon the insured's refusal to permit the defense of the suit under a reservation of rights agreement, Ranger's options were to withdraw from the suit or to remain and defend the insured unconditionally. The law does not require an insured to accept a defense under a reservation of rights agreement or a non-waiver agreement. *American Fidelity & Casualty Co. v. Williams,* 34 S.W.2d 396, 403 (Tex.Civ.App.1930, writ ref'd); *Ranger Insurance Co. v. Rogers,* 530 S.W.2d 162, 167 (Tex.Civ.App.1975, writ ref'd n.r.e.). It is plain under this record that the insured never consented to Ranger's defense of the suit under a reservation of rights agreement.

We conclude that Ranger's refusal to offer the insured an unconditional defense resulted in a waiver of its right to insist upon the insured's compliance with the no-action clause. Ranger's points of error are overruled.

Judgment is here rendered declaring that McKnight was properly rated for the flight in question; hence, insurance coverage existed. It is further declared that Ranger's refusal to offer the insured an unconditional defense resulted in a waiver of its right to insist upon the insured's compliance with the no-action clause.